STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. FLOR-
ENCE B. JOHNSON, DEFENDANT-RESPONDENT.

Argued October 8, 1963—Decided April 20, 1964.

147

148

149

*Mr. Peter Murray,* Assistant Essex County Prosecutor argued the cause for plaintiff-appellant (*Mr. Brendan T. Byrne,* Essex County Prosecutor, attorney; *Mr. Murray,* of counsel and on the brief).

*Mr. Herman D. Michels* argued the cause for defendant-respondent (*Messrs. Toner, Crowley, Woelper & Vanderbilt,* attorneys; *Mr. Jay E. Bailey* and *Mr. Michels,* of counsel; *Mr. Alan W. Kempler,* on the brief).

The opinion of the court was delivered by

HALL, J. This appeal derives from defendant's conviction in the Livingston Municipal Court for operating a motor vehicle "while under the influence of intoxicating liquor" in violation of *N. J. S. A.* 39:4–50, which provides in pertinent part as follows:

"A person who operates a motor vehicle while under the influence of intoxicating liquor * * * shall be subject, for a first offense, to a fine of not less than two hundred nor more than five hundred dollars ($500.00), or imprisonment for a term of not less than thirty days nor more than three months, or both, in the discretion of the magistrate, and shall forthwith forfeit his right to operate a motor vehicle over the highways of this State for a period of two years from the date of his conviction. For a subsequent violation, he shall be imprisoned for a term of three months and shall forfeit his right to operate a motor vehicle over the highways of this State for a period of ten years from the date of his conviction * * *."

She was again found guilty on review by the Essex County Court, which heard the case *de novo* upon the stenographic transcript of the municipal court trial. *N. J. S.* 2A:3–6; *R. R.* 3:10–1, 3:10–2 and 3:10–10. Both courts imposed the same sentence—imprisonment for three months, plus revocation of driver's license for a period of 10 years—which they conceived to be mandatory under the quoted section, since defendant had been convicted of the same offense some three or four years previously. The Appellate Division reversed the conviction on her further appeal. We granted the State's petition for certification. 39 *N. J.* 240 (1963).

The case is particularly important on the matter of the effect of *N. J. S. A.* 39:4–50.1 authorizing the chemical analysis of bodily substances to determine the amount of alcohol in a motor vehicle operator's blood and setting forth the efficacy of the results of such tests in relation to the offense. Although enacted in 1951, *L.* 1951, *c.* 23, § 30, this is the first occasion for consideration of it by this court. It reads:

"In any prosecution for a violation of section 39:4–50 of Title 39 of the Revised Statutes relating to driving a vehicle while under the influence of intoxicating liquor, the amount of alcohol in the defend-

ant's blood at the time alleged as shown by chemical analysis of the defendant's blood, urine, breath, or other bodily substance shall give rise to the following presumptions:

 1. If there was at that time 0.05 per centum or less by weight of alcohol in the defendant's blood, it shall be presumed that the defendant was not under the influence of intoxicating liquor;

 2. If there was at that time in excess of 0.05 per centum but less than 0.15 per centum by weight of alcohol in the defendant's blood, such fact shall not give rise to any presumption that the defendant was or was not under the influence of intoxicating liquor, but such fact may be considered with other competent evidence in determining the guilt or innocence of the defendant;

 3. If there was at that time 0.15 per centum or more by weight of alcohol in the defendant's blood, it shall be presumed that the defendant was under the influence of intoxicating liquor.

The foregoing provisions of this section shall not be construed as requiring that evidence of the amount of alcohol in the defendant's blood must be presented, nor shall they be construed as limiting the introduction of any other competent evidence bearing upon the question whether or not the defendant was under the influence of intoxicating liquor. No chemical analysis, as provided in this section, or specimen necessary thereto, may be made or taken unless expressly consented to, or requested by, the defendant."

The evidence presented by the prosecution fell into three categories: lay testimony of police officers, medical opinion by an examining physician, and a reading of 0.18 per centum by weight of alcohol in the blood as shown by chemical analysis of the breath through use of the Harger drunkometer utilizing the volumetric method. The defense sought to establish, principally by expert testimony, that the factual bases for the lay and medical opinions introduced by the State were insufficient to support the conclusion of operation while under the influence of intoxicants. It further urged that the drunkometer is inherently inaccurate in measurement of the percentage of alcohol in the blood and that, in any event, this test was improperly conducted. A particular thrust of the defense proofs was that such deviations from normal in defendant's physical condition as existed were to be attributed to hypertension and hyperthryoidism, for which she was under treatment, rather than to the effect of liquor.

The automobile defendant was driving was stopped by the police about 5:15 P. M. on an August day. The proof as to

any erratic driving was sparse, since the car had proceeded only about 500 feet from where it had been parked. The police had received information to the effect that a person who appeared to be intoxicated was operating a motor vehicle in the area. The officers at the scene observed the vehicle, a small foreign-make car, pull away from the curb and travel at a very slow rate of speed so as to cause other traffic to slow almost to a stop. The driver appeared to be having trouble shifting gears—the clutch operated electrically and the shift was manual—with resultant grinding noises. (The defense presented testimony of prior difficulty in shifting and necessary clutch repairs, which were said to be inherent in the model.)

One of the policemen whistled defendant to the side of the road and asked for her license, which was produced after some fumbling. Her face was slightly flushed and her eyes bloodshot. An odor of alcohol was detected, but she insisted, as she did several other times to the officers thereafter, that she had not had a thing to drink. She was then asked to get out of the car, which she did with considerable difficulty. When requested to walk in front of the car, she staggered, swayed and was not able to walk normally. She agreed to take a drunkometer test and was taken to headquarters in a police car. While not belligerent during the trip, she kept repeating that she had to get home to feed her husband, that the police were picking on her, and that she had harmed no one. Upon arrival, she was unable to walk up the steps by herself and had to be assisted. By this time, she was crying and obviously nervous and very excited. As she testified: "I was * * * afraid * * * I'd lose my license and I can't get around home without one except by cab."

The drunkometer test was administered promptly, to which defendant gave oral consent, producing the 0.18 per centum reading previously mentioned. According to the operator, she had considerable difficulty blowing air into the balloon associated with the apparatus.

The examination by the police physician followed. This was had in the presence of two of the apprehending patrolmen and began about an hour and a half after that event. The doctor found her neatly dressed, oriented and with normal speech and face color. She was crying and under some tension, but cooperative rather than argumentative. Apparently there was no evidence of euphoria. There was a strong odor of alcohol on her breath, her eyes were slightly bloodshot, and pulse rate rapid and blood pressure abnormally high. She stated that she had had only one drink that day—in the morning—but was confused as to the hour. She advised the doctor of being under medical care and medication for a thyroid condition and stated she felt "fine." He then had her perform the conventional neurological tests for balance and coordination. About half were performed successfully. The others, particularly involving balance, resulted in marked abnormality with wide degrees of swaying to the extent that she had to be supported. Based on his examination, the doctor concluded that Mrs. Johnson had consumed sufficient alcohol to affect her faculties and "was sufficiently under the influence of liquor to be a non-safe driver on the road." He stated that, in reaching this opinion, he had made lenient allowance for the effect of a hyperthyroid and hypertensive condition. The two police officers who participated in the arrest and observed the medical examination also testified that, in their opinion, without regard to the drunkometer reading, defendant was under the influence of intoxicating liquor.

The defense revolved primarily around three expert witnesses. The defendant herself first testified, in course of which she admitted to having imbibed to the extent of two two-ounce jiggers of rum, with water, during the afternoon. The first drink was about 3:30 P. M. and the second approximately an hour later, shortly after which she left her home in Short Hills to go to Livingston to purchase a bottle of liquor. It was after the purchase had been made and she was starting the return trip that the police apprehended her at, as has been

said, about 5:15 P. M. In view of her denials to the police of any drinking and the statement to the examining doctor that she had had only one drink, and that in the morning, the trier of the facts could well doubt the complete truthfulness of her testimony.

The first expert was a physician, not previously acquainted with the defendant, who examined her at police headquarters at her husband's request some three hours after she was taken into custody and again five days later when she was free of all alcohol. His findings of the first examination did not differ substantially from those of the police physician. While there was improvement in several aspects on the second, he was unable to tell whether she was under the influence of alcohol on the first occasion because he could not determine whether the abnormal findings were due to the intake of alcohol or the effects of extreme tension.

The second expert witness was the defendant's personal physician who had treated her for some time for hypertension and hyperthyroidism. The symptoms of the latter he described as great nervous tension, tremors and palpitations, elevated blood pressure and ataxia resulting in lack of coordination of the hands and legs. During his treatment he had noticed the defendant's inability to walk, stand and perform the various neurological tests with complete control. It was his opinion that alarm or anxiety reaction can, within a minute, aggravate the condition and symptoms and would adversely affect her ability to perform the tests administered by the police physician and could account for all the latter's findings except the breath odor of alcohol. He was unable to say, however, what effect four ounces of alcohol would have on Mrs. Johnson's condition and, of course, since he was not present, could give no opinion as to whether she was under the influence on the day in question.

The final defense witness was Dr. Charles J. Umberger, a toxicologist, who had made studies on the physiological action of alcohol, but had never examined the defendant. In his view, which differs from that of most other authorities, the

breath test to determine the amount of alcohol in the blood, while not completely valueless, is not a sufficiently accurate or precise measurement, since its basis is that of the statistically average, normal individual. He felt this was particularly so in this case because the defendant had a thyroid condition. He did not indicate, however, physiologically why, in what direction or to what extent the reading would be inaccurate. It was also his opinion that the results of neurological tests here were inconclusive because defendant did not fail them all and by reason of the fact that, while muscular coordination was affected, he saw no evidence of effect on the central nervous system, as by slurred speech, euphoria and argumentativeness, which should be hit first and hardest by alcohol. Testifying hypothetically, he could not say whether Mrs. Johnson was or was not under the influence of alcohol without further medical testing and evaluation.

The magistrate, in a written opinion, held the result of the drunkometer test properly admissible since the proofs established that the machine and its components were in order, the operator was qualified and the test properly administered and that the State was entitled to the statutory presumption arising from the reading. He found the testimony of the police officers and the police physician convincing "of the inebriated condition of defendant and the resulting deleterious effect, to a great extent on her physical coordination and to a lesser extent of her mental faculties." Although "cognizant" of the defense evidence, he obviously found it unpersuasive for he said most of it "appears to be based upon conjecture, theory and inference and not upon observation and tests made within a short time of defendant's apprehension." This evaluation must be considered to extend to the evidence critical of the drunkometer and the accuracy of the reading in this case. Nonetheless, he stated that he did not find the reading sufficient, standing alone, to prove guilt beyond a reasonable doubt. (This is, of course, the requisite standard in a so-called *quasi*-criminal proceeding. *State v. Emery*, 27 *N. J.* 348, 353 (1958).) This statement was not

explained, *i. e.,* whether it was intended as a general proposition or only in the light of the evidence in this case. He spoke of the finding as confirming the opinions of the police officers and the physician and found guilt meeting the required standard from the testimony of the policemen and the State's doctor coupled with the drunkometer reading.

The County Court, on its *de novo* consideration of the record, reached the same conclusion perhaps on a different approach. (Its function is to determine the case completely anew on the record made in the Municipal Court, giving due, although not necessarily controlling, regard to the opportunity of the magistrate to judge the credibility of the witnesses. *State v. Ronnie,* 41 *N. J. Super.* 339, 343 (*Cty. Ct.* 1956); *cf. Donofrio v. Haag Brothers, Inc.,* 10 *N. J. Super.* 258, 262 (*App. Div.* 1950); *State v. Ingram,* 67 *N. J. Super.* 21, 33–35 (*Cty. Ct.* 1961).) Its fact findings were contained in a single sentence: "In addition to the testimony concerning the drunkometer test, there was sufficient evidence from other sources to sustain the conviction, including that of Dr. Weber [the police physician] who examined the defendant shortly after the arrest." Although not entirely clear, it must be assumed the judge also found the drunkometer reading to be properly admissible and it may be inferred, since he did not speak of it as merely confirmatory and corroborative, that he also believed it sufficient, standing alone, to warrant conviction.

The Appellate Division, which in this situation reviews only the action of the County Court, *State v. Joas,* 34 *N. J.* 179, 184 (1961), defined its scope of review in this language: "\* \* \* this court does not weigh the evidence anew but merely determines whether the evidence supports the judgment of conviction." It found the drunkometer "to be sufficiently established as a scientific and accurate device to admit testimony of reading obtained from a properly conducted test without prefatory expert testimony" and the test to have been properly conducted in this instance. The assumption has to be that the court found the 0.18 per centum reading to be an

accurate indication of the amount of alcohol in defendant's blood. It went on to say that the presumption thereby created under *N. J. S. A.* 39:4–50.1 is rebuttable and by no means conclusive and spoke of evidence corroborating the result of a drunkometer test as "particularly significant." It then found that "[r]eviewing the testimony, * * * defendant has successfully rebutted the presumption gained by the State from the drunkometer test." To support this finding, it enumerated that defendant's difficulty in operating the automobile and grinding the gears had been explained by the testimony of malfunction and necessity of repairs; that the tests given by the municipal doctor were performed successfully in a majority of instances and those which were not were readily explainable on the basis of defendant's hypertension and hyperthyroidism; that her speech was clear, her clothing neat, her behavior proper and orientation good; and that she was cooperative, not argumentative and had not been involved in any accident. Despite the initial definition of its scope of review, its conclusion was that "* * * while there was some evidence of defendant's consumption of alcoholic beverages, the case presented by the State lacks the weight of certainty sufficient to establish her guilt beyond a reasonable doubt."

The fundamental question before us concerns the scope of review of a nonjury cause in the Appellate Division and the propriety and correctness of that tribunal's exercise thereof in this case. The State makes its point in this language: "The court below improperly weighed the evidence and substituted its judgment for that of the trier of the facts."

There can be no doubt of the *power* of the appellate tribunals of this State, certainly since the *Constitution of 1947*, to review the fact determinations of a trial court in all cases heard without a jury and to make new or amended findings. See *Const.* 1947, *Art.* VI, *sec.* V, *pars.* 1, 2 and 3. *Cf. Hager v. Weber*, 7 *N. J.* 201, 211 (1951); *Colacurcio Contracting Corp. v. Weiss*, 20 *N. J.* 258, 264 (1955). The power extends equally and uniformly to every type of cause, legal or equitable, civil, criminal and those, as here, involving a penal

offense not reaching the stature of a crime.[1] The broad implementation of the power, and the sole restraint thereon, is found in *R. R.* 1:5–4(b), made applicable to the Appellate Division by *R. R.* 2:5, which reads:

"On a review of any cause, criminal or civil, involving issues of fact not determined by the verdict of a jury, new or amended findings of fact *may* be made, but due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." (Emphasis supplied)

This expression of permissive, but non-compulsory, power resulted in far-reaching changes in the former practice in many classes of cases. While appellate review of equitable actions always permitted a *de novo* trial on the record, the practice on appeal in actions at law, circumscribed by legislation and rigid common law rules, limited appellate review of facts, whether the suit was tried by a judge alone or with a jury. The new practice enables our appellate courts to assimilate appeals in nonjury actions at law to the former practice in suits in equity. It does not mean, however, that such cases must or should be retried on appeal. "* * * [T]he trial judge or the jury is still the primary trier of fact * * * [T]he deference which appellate courts must accord such findings should be determined by considerations of policy and practicality." Brochin and Sandler, "Appellate Review of Facts in New Jersey, Jury and Non-Jury Cases," 12 *Rutgers L. Rev.* 482, 484 (1958).

The problem in this case, as in many previous ones, is posed in this quotation. As Chief Justice Weintraub said, in a different but still pertinent context, in his concurring opinion in *Russo v. United States Trucking Corp.*, 26 *N. J.* 430, 441 (1958): "The right to be heard is assured; the extent of the

---

[1] We are not involved with and so do not consider any refinements or differences in the scope of review, either as to power or practice, of factual determinations made by municipal, county or state administrative bodies. See *R. R.* 4:88–13.

review remains unspecified \* \* \* What remains to be answered is the question, when does 'may' become 'should'?" (at *pp.* 442–443).[2]

The question is not easily answered, because of the difficulty of verbal articulation of a necessarily nebulous concept. There is general agreement that the power to overturn trial court findings, and redeterminative review of the record in that focus, should not be undertaken in every nonjury appeal. As one decision puts it: "\* \* \* it was not the purpose of *R. R.* 1:5–4(b) to leave the trial judge \* \* \* as a mere receiver of impressions of credibility, functioning simply to frame a record upon which the appellate court pronounces judgment." *Greenfield v. Dusseault,* 60 *N. J. Super.* 436, 444 (*App. Div.* 1960), affirmed 33 *N. J.* 78 (1960). Efforts in our cases to articulate a standard have been many and varied in expression. Perhaps they have been more confusing than clarifying in trying to phrase a workable guide of general application. Brochin and Sandler in their article, *supra,* collect many:

"New Jersey courts under the new system have held that findings of fact made by trial judges in non-jury cases must be affirmed if amply supported by the evidence; or by competent, reasonably credible evidence; that such findings are entitled to great weight on appeal; that they are entitled to every intendment in their favor and must not be reversed merely because a doubt is raised; that they must not be set aside unless so plainly unjustified by the evidence that interests of justice necessitate their nullification; or unless in conflict with the preponderating proofs; or so manifestly unsupported by or discordant with competent, relevant, and reasonably credible evidence as to offend the interest of justice." (12 *Rutgers L. Rev.,* at *pp.* 484–485)

---

[2] We are not dealing with those situations where the Appellate Division or this court *must* review the fact finding *de novo. E. g.,* by virtue of special constitutional provision, *Russo v. The Governor of the State of New Jersey,* 22 *N. J.* 156, 167–168 (1956); because of the constitutional question involved and the requirements imposed by the United States Supreme Court, *State v. Smith,* 32 *N. J.* 501, 549 (1960); in workmen's compensation cases, *Russo v. United States Trucking Corp., supra* (26 *N. J.* 430) and *Ricciardi v. Marcalus Manufacturing Co.,* 26 *N. J.* 445 (1958), but see *McAllister v. Board of Education, Town of Kearny,* 42 *N. J.* 56 (1964).

To this list may be added that standard found in earlier opinions of this court involving appeals from convictions for motor vehicle violations (one frequently finds the same type of phrasing repeated in a certain class of case) : "Our function on appeal ordinarily is not to make new factual findings but simply to decide whether there was adequate evidence before the County Court to justify its finding of guilt." *State v. Dantonio,* 18 *N. J.* 570, 575 (1955) ; "It is not our function in reviewing the conviction in question to weigh the evidence anew and to make independent findings of fact as if we were sitting in first judgment on the case. Rather, our obligation is to determine whether there is adequate evidence to support the judgment rendered below." *State v. Emery,* 27 *N. J.* 348, 353 (1958).

Certain broad principles are paramount and helpful in an appellate court's approach to this aspect of the decision-making process, a restatement of which we trust will serve to eliminate some of the confusion for the benefit of future cases and provide the foundation for our evaluation of the Appellate Division's action in this cause. The contention that the trial court erred in its determination of the facts, whether underlying or ultimate, may be urged on appeal in any non-jury case, as the defendant did here in the Appellate Division. The appellate tribunal's obligation is the same—no greater and no less—in each type of such cases, recognizing, however, the legal differences in the required burden of proof, *e. g.,* beyond a reasonable doubt in criminal and *quasi*-criminal proceedings as against fair preponderance of the evidence, generally, in civil actions. It must review the record in the light of the contention, but not initially from the point of view of how it would decide the matter if it were the court of first instance. It should give deference to those findings of the trial judge which are substantially influenced by his opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy. (See the discussion by Brochin and Sandler, *supra,* on the "credibility" factor, 12 *Rutgers L. Rev.,* at *pp.* 484–490).

■■ The aim of the review at the outset is rather to determine whether the findings made could reasonably have been reached on sufficient credible evidence present in the record. This involves consideration of the proofs as a whole; the appraisal is not to be confined simply to those offered by the plaintiff, for the question is not simply whether there was enough evidence to withstand a defense motion at the end of the plaintiff's case or of the entire case. When the reviewing court is satisfied that the findings and result meet this criterion, its task is complete and it should not disturb the result, even though it has the feeling it might have reached a different conclusion were it the trial tribunal. That the case may be a close one or that the trial court decided all evidence or inference conflicts in favor of one side has no special effect.

■ But if the appellate tribunal is thoroughly satisfied that the finding is clearly a mistaken one and so plainly unwarranted that the interests of justice demand intervention and correction (see *e. g.,* the expressions in *Capone v. Norton,* 11 *N. J. Super.* 189, 193–194 (*App. Div.* 1951), affirmed 8 *N. J.* 54 (1951) ; *Trusky v. Ford Motor Co.,* 19 *N. J. Super.* 100, 103–105 (*App. Div.* 1952) ; and *Greenfield v. Dusseault, supra* (60 *N. J. Super.,* at *p.* 444)), then, and only then, it should appraise the record as if it were deciding the matter at inception and make its own findings and conclusions. While this feeling of "wrongness" is difficult to define, because it involves the reaction of trained judges in the light of their judicial and human experience, it can well be said that that which must exist in the reviewing mind is a definite conviction that the judge went so wide of the mark, a mistake must have been made. This sense of "wrongness" can arise in numerous ways—from manifest lack of inherently credible evidence to support the finding, obvious overlooking or under-evaluation of crucial evidence, a clearly unjust result, and many others. This, then, is when and how the permissive power of *R. R.* 1:5–4(b) should be utilized by the first appellate tribunal and is what our prior cases mean no matter how they have expressed it.

There remains to consider the view this court should take when, as here, we are called upon to review the action of the Appellate Division in passing upon a claim that the trial court's fact findings were wrong. Again, it is difficult to articulate a precise standard. The scope of review, in the sense of *power*, is the same under *R. R.* 1:5–4(b) as in the Appellate Division. The issue is, however, slightly different. While the mechanical steps of our review we are about to set forth may, in actuality and almost of necessity, become merged, conceptually the mental operations are distinct.

■ The first inquiry should be whether the Appellate Division initially approached the review correctly, *i. e.*, in accordance with the first step principles previously discussed. If we determine that it did not, then we ought to treat the case as the intermediate tribunal should have, pursuant to the first step, and if then necessary, the second step, principles. If it did approach the matter correctly, our consideration is somewhat more limited because a reviewing tribunal has already considered the matter and the question is whether *that court* was right or wrong in sustaining or upsetting the trial court findings. The nature of our review may well depend on whether agreement or disagreement with the trial court's findings resulted. In the former situation, while there can be no hard and fast rule, the fact of agreement cannot help but be thrown upon the scales. See Brochin and Sandler, *supra,* 12 *Rutgers L. Rev.,* at *p.* 488, and cases collected at notes 47, 48 and 49. If the Appellate Division has found the trial judge was wrong, we almost instinctively scrutinize the record more searchingly. In the first situation our function is to determine, under the principles previously discussed, whether both courts were clearly in error; in the second, it is to decide whether the Appellate Division itself was manifestly mistaken in concluding that the trial court had gone too wide of the mark.

In the light of all these principles, we are convinced the Appellate Division incorrectly approached its review of the County Court's finding that defendant was, beyond a reasona-

ble doubt, under the influence of intoxicating liquor. We take it that when the court said that "[o]n review, this court does not weigh the evidence anew, but merely determines whether the evidence supports the judgment of conviction," it was purporting to state its function in accordance with the standards we have discussed, albeit in the shortened form like that utilized in the analogous cases of *State v. Dantonio, supra* (18 *N. J.* 570) and *State v. Emery, supra* (27 *N. J.* 348). However, the subsequent discussion of the evidence in its opinion and the conclusion that "the case presented by the State lacks the weight or degree of certainty sufficient to establish her guilt beyond a reasonable doubt" clearly establishes to our mind that the court felt, probably because the matter was of a general criminal nature, that it was mandatory to re-try and determine the case on the record as if it were the trial court. This, as we have pointed out, was an erroneous view. If we now approach it as the intermediate tribunal should have, we have not the slightest doubt that the finding of the trial court was an eminently proper one for it to have reached on the evidence and should not be disturbed. Before explaining our reasons for this conclusion, we ought briefly to spell out the essentials of the offense charged (aside from the matter of operation of a motor vehicle by the defendant at the time, which was not in dispute here).

The vital requirement of *N. J. S. A.* 39:4–50 and its predecessors, like the comparable statutes of most other states, is operation "under the influence of intoxicating liquor." The phrase was not self-defining and required judicial ascertainment of the legislative intent, now long settled in this State in substantial conformity with that reached elsewhere. At the one pole, since "intoxication" is not the expression used, it is not requisite that "* * * the accused be absolutely 'drunk,' in the sense of being sodden with alcohol." *State v. Emery, supra* (27 *N. J.,* at *p.* 355). At the other extreme, the described condition means something more than having partaken of a single drink even though, physiologically, the

smallest amount of alcohol has some slight effect or influence on an individual.

The obvious intention of the Legislature was to prescribe a general condition, short of intoxication, as a result of which every motor vehicle operator has to be said to be so affected in judgment or control as to make it improper for him to drive on the highways. This purpose is grounded in the common knowledge that a great number of serious accidents have involved drinking drivers—a fact which becomes of greater importance and public concern almost daily in this motor age with ever increasing vehicle speeds, the constantly growing number of vehicles on the roads and the staggeringly mounting accident toll. So it is clear that it is not essential to sustain the charge that the particular operator could not safely drive a car, although proof of the erratic manner or result of his driving is admissible as evidence of the existence of the statutory condition. Conversely, proof that he could operate with safety will not, in and of itself, absolve him. *State v. Rodgers*, 91 *N. J. L.* 212, 215, 217 (*E. & A.* 1917).

The proper definition of the crucial element was early established in New Jersey in *Rodgers*:

"The expression 'under the influence of intoxicating liquor' covers not only all the well-known and easily recognized conditions and degrees of intoxication, but any abnormal mental *or* physical condition which is the result of indulging in any degree in intoxicating liquors and which tends to deprive him of that clearness of intellect and control of himself which he would otherwise possess." (91 *N. J. L.*, at *p.* 215; emphasis supplied)

It has been more recently rephrased by this court, but without change in substance, in *State v. Emery, supra*: "It is sufficient if the presumed offender has imbibed to the extent that his physical coordination *or* mental faculties are deleteriously affected." (27 *N. J.*, at *p.* 355; emphasis supplied). As the definition indicates, evidence of impairment of *both* physical and mental faculties is not necessary. *State v. Ash*, 21 *N. J. Super.* 469, 475 (*App. Div.* 1952). Though body physiology is primarily involved and the proscribed state thus has medical

connotations, expert evidence is not essential and guilt can be established on lay testimony alone. *State v. Pichadou,* 34 *N. J. Super.* 177 (*App. Div.* 1955.)[3]

 In the light of this legal definition of the offense and the nature of the evidence sufficient to establish its commission, it is plain to us that a finding of guilt here was entirely justified on the proofs, even without consideration of the drunkometer reading. We need not repeat the full details of the evidence earlier recounted. There was the admission of the consumption of a considerable amount of liquor within a relatively short period of time before the police stopped the car. The observations and opinion of experienced officers, having no reason to be biased against defendant, could reasonably be found persuasive, especially their testimony concerning her condition and behavior before the arrival at police headquarters. The opinion of the examining physician, equally nonpartisan, could justifiably be relied upon as ample in itself, particularly when he had knowledge of her physical ailments for which he testified he made lenient allowance in appraising the results of the balance tests. There was adequate evidence of deleterious effect upon physical coordination attributable to liquor. The trial court did not have to accept the hypothetical or neutral testimony of defendant's expert witnesses. The fact that some of the signs of alcoholic influence in the mental or central nervous system sphere did not manifest themselves as obviously as in some cases does not require a contrary conclusion, either legally or factually, for it is well known, as one of defendant's medical witnesses said, that alcohol has differing external effects on people, depending

---

[3] Moreover, although not pertinent under the State's theory in the instant case, the impaired state need not result solely from the consumption of alcohol. It is sufficient if it comes about from the combined effect thereof and any pre-existing or predisposing condition of the individual, whether inherent or produced by medication. In such situations, the person may be guilty of the offense even though the amount of alcohol consumed would be insufficient to produce the proscribed result were it not for the individual's particular condition, so long as the alcohol is a contributing factor. *State v. Glynn,* 20 *N. J. Super.* 20 (*App. Div.* 1952).

upon the basic personality of the person in question. See generally *State v. Ingram,* 67 *N. J. Super.* 21, 36 (*Cty. Ct.* 1961); *State v. Ash, supra* (21 *N. J. Super.* 469); *cf. State v. Matchok,* 14 *N. J. Super.* 359 (*App. Div.* 1951).

That the trial court made no mistake is demonstrated beyond any possible question by the drunkometer reading of 0.18 per cent—an item of the proof which the magistrate and the Appellate Division, and perhaps even the County Court, did not give the full effect *N. J. S. A.* 39:4–50.1 intends and, indeed, requires.

The criterion of operating "under the influence of intoxicating liquor" always presented practical enforcement difficulties, both from the standpoint of the public interest intended to be protected and the accused defendant. Opinions based on objective-symptom observations and tests, whether lay or medical, were bound to be somewhat inexact in fairly applying such a broad statutory standard. On the one hand, many guilty defendants escaped conviction because all of the external manifestations of the effects of alcohol are not displayed by every person and, on the other, certain individual pathological conditions may cause a non-intoxicated person to manifest one or more of the symptoms also produced by the use of liquor. And it has long been recognized by men of science that consumption of a certain quantity of alcohol does adversely affect the judgment and control of *every* person regardless of the extent of external manifestations or preexisting individual condition. What was needed to properly and fairly protect against the drinking driver was a test which could be easily and promptly administered by law enforcement officials and would, with sufficient accuracy, establish the amount of alcohol in the subject's system and a measurement criterion which would scientifically establish "under the influence" for purposes of the motor vehicle operation statute. The result of years of study and experimentation under the auspices of the National Safety Council Committee on Tests for Intoxication and the American Medical Association was the recommendation about 1938 of blood alcohol levels as an

index of intoxication, of the use of chemical analysis of blood, urine, breath or other bodily substance to determine such content and of a scale of the effect of particular ranges of alcoholic concentration a shown by such tests. From a legal standpoint, the recommendation was implemented by Uniform Vehicle Code § 11-902(b) proposed by the National Committee on Uniform Traffic Laws and Ordinances, which was adopted in New Jersey almost verbatim in 1951 by *N. J. S. A.* 39:4–50.1, quoted in full at the beginning of this opinion. The recommended statute, or a substantial equivalent, is now in force in about 32 states and its theory is followed as a matter of common law in several others.

This whole field, including the present state of knowledge, is thoroughly and authoritatively discussed from physiological, chemical, and legal points of view in *Manual, Chemical Tests for Intoxication, Committee on Medicolegal Problems, American Medical Association* (1959) ("Manual"); Slough and Wilson, "Legal By-Products of Chemical Testing for Intoxication," 11 *Clev.-Mar. L. Rev.* 1 (1962) (substantially reproducing but updating an article by the same authors, "Alcohol and the Motorist: Practical and Legal Problems of Chemical Testing," 44 *Minn. L. Rev.* 673 (1960)); and the testimony of leading authorities[4] before the New Jersey Senate Committee on Highways, Transportation and Public Utilities, Public Hearing on Assembly Bill No. 46, April 10, 1963 ("Senate hearing"). We have relied on these materials in the statements and conclusions hereafter set forth, as to non-legal aspects, dealing with the meaning and effect of the

---

[4] Dr. H. Ward Smith, Assistant Professor of Pharmacology at the University of Toronto, Director of the Attorney-General's Laboratory for the Province of Ontario; Dr. Leon A. Greenberg, Professor of Physiology at Rutgers University, Director of Laboratory Research at Rutgers Center of Alcohol Studies, founder of Center of Alcohol Studies at Yale University; Dr. Robert B. Forney, Professor of Toxicology and Pharmacology at Indiana University School of Medicine, Director of Indiana State Laboratory for Toxicology, Chairman of the National Safety Council Committee on Alcohol and Drugs; Robert L. Donigan, General Counsel for the Traffic Institute of Northwestern University.

statute, pursuant to the judicial obligation to give appropriate recognition to scientific discoveries and truths as they attain sufficient trustworthiness. *State v. Dantonio, supra* (18 *N. J.* 570); see Brooks, "Evidence," 14 *Rutgers L. Rev.* 390, 393–394 (1960).

▮ *N. J. S. A.* 39:4–50.1 declares legislative acceptance of scientific truths, well settled in 1951 and even more fully established today in the light of continuing study and experimentation. Alcoholic content in the blood furnishes a scientific measure of the extent of the influence of liquor upon the person and chemical analysis of the blood itself, urine, breath and other bodily substances is a scientifically accurate method of ascertaining that content. See *Breithaupt v. Abram,* 352 *U. S.* 432, 439, 77 *S. Ct.* 408, 1 *L. Ed. 2d* 448, 458 (1957).

▮ The stated presumption, that if at least 0.15 per cent of alcohol is present in the blood the subject is under the influence of intoxicating liquor for the purposes of operation of a motor vehicle, recognizes the universally accepted truth that such is physiologically the case with respect to every person, regardless of the extent of usual external manifestations, individual tolerance for alcohol or pre-existing individual physical conditions or idiosyncracies. This fact was judicially recognized in this State, even before the adoption of the statute by Judge (now Mr. Justice) Brennan in *State v. Hunter,* 4 *N. J. Super.* 531, 534 (*App. Div.* 1949). See also *State v. Protokowicz,* 55 *N. J. Super.* 598, 602 (*App. Div.* 1959. The experts testifying at the Senate hearing stated that in thousands of tests conducted over the years, no one had ever been found with that quantity of alcohol in his blood who was not so seriously impaired in his faculties, irrespective of external manifestations, that he should not operate a motor vehicle. Indeed, the scientific conclusion has now been reached that the level is attained when the percentage is only 0.10 and the revised Uniform Vehicle Code, § 11-902(b)3 (1962) declares that the presumption shall come into operation at that figure. Some foreign countries have already fixed that level and two even use .05 per cent.

The statute neither details the particular kinds of bodily substance tests which are acceptable nor does it specifically state that the results are admissible in evidence. There can be no doubt, however, but that the Legislature has inferentially said that the result of a reliable test, properly administered, is admissible. The real question is the reliability of a particular kind of test. Several have been developed over the years, principally utilizing on-the-spot analysis of the breath. Indeed, the experts at the Senate hearing testified that the breath test is presently regarded as more accurate than an analysis of the blood itself. This method has the advantage of prompt and easy administration by non-medically trained personnel and with relatively inexpensive equipment. Various devices are in common use: the Harger drunkometer involved in this case (originally employing an ascarite tube but for several years as efficiently utilizing only the volumetric method), the alcometer, the breathalyzer, the drunkotester and the intoximeter. All are now generally scientifically recognized as sufficiently reliable. As the American Medical Association Manual puts it:

"Under properly controlled conditions, which include proper training and continuing expert supervision of competent operators and adequate expert control of equipment, reagents and procedures, the on-the-spot tests are also capable of yielding accurate breath alcohol concentration results, acceptable as an index of blood alcohol concentration of adequate reliability for clinical and legal purposes." (at p. 30)

Our own trial courts and the Appellate Division have long recognized and acted upon this scientific conclusion, expressly or impliedly. In early days, of which *State v. Hunter, supra* (4 *N. J. Super.*, at *p.* 535) is an instance, expert evidence was commonly introduced to establish that fact, but in recent years such foundation testimony has not been required under the theory of judicial notice. See *State v. Dantonio, supra* (18 *N. J.* 570). As Judge Gaulkin said in *State v. Miller,* 64 *N. J. Super.* 262, 268 (*App. Div.* 1960):

"The Drunkometer is sufficiently established and accepted as a scientifically reliable and accurate device for determining the alcoholic content of the blood to admit testimony of the reading obtained upon a properly conducted test, without any need for antecedent expert testimony by a scientist that such reading is a trustworthy index of blood alcohol, or why."

See also *State v. Brezina*, 45 *N. J. Super.* 596 (*Cty. Ct.* 1957); *State v. Damoorgian*, 53 *N. J. Super.* 108 (*Cty. Ct.* 1958); *State v. Protokowicz*, *supra* (55 *N. J. Super.* 598); *State v. Greul*, 59 *N. J. Super.* 34 (*Cty. Ct.* 1959); *State v. Burger*, 74 *N. J. Super.* 208 (*App. Div.* 1962). And, it should be added breath tests have been accepted by the appellate courts of every jurisdiction, save one, where the question has arisen. See Slough and Wilson, *supra* (11 *Clev.-Mar. L. Rev.*, at *pp.* 9–10 and cases collected therein).

We, therefore, have no hesitancy in adopting Judge Gaulkin's statement as correctly stating the law of this State. This conclusion cannot be affected by the fact that there are some, like defendant's witness in this case, who dispute the precise accuracy of the device and that there is a possibility of error. Practically every new scientific discovery has its detractors and unbelievers, but neither unanimity of opinion nor universal infallibility is required for judicial acceptance of generally recognized matters. While such testimony is probably technically still admissible, its probative value and weight is almost nil in the present state of knowledge of the scientific and medical community.

It is, of course, most essential, in view of the heavy impact the result can have, that proper administration of the test be clearly established before the reading is admitted in evidence. This includes full proof that the equipment was in proper order, the operator qualified and the test given correctly (as well as the fact that the defendant consented orally or in writing). The magistrate and the Appellate Division here found expressly, and the County Court impliedly, that these conditions had been established. These findings were entirely justified by the evidence and we see no reason whatsoever to disagree with them.

 In what has become the usual practice in this State, the condition and operation of this municipally-owned drunkometer was under the supervision of a trained member of the State Police who understood the theory of the device and the test. The machine was under his periodic inspection. He had placed a fresh bottle of potassium permanganate, which he had tested and found to be of proper strength, in the instrument some 19 days before use upon the defendant and had retested the chemical, with proper result, about 13 days afterward. The local police officer, who actually gave the test, had successfully completed a forty-hour course for a drunkometer operator given by the State Police. He knew how to operate the machine mechanically, had administered many tests previously, and could apply the pertinent formula to the finding to calculate the percentage of alcohol in the blood. His detailed testimony was that he prepared the apparatus, conducted the test and computed the reading as he had been instructed. This is enough, as to this particular device in the present state of general scientific knowledge thereof, to ground admissibility of the result, and there was nothing of substance offered by the defendant to affect its weight adversely. Neither the supervisor nor the operator need be a scientist and the operator does not have to understand the technical theory. *State v. Greul, supra* (59 *N. J. Super.*, at 38); *State v. Damoorgian, supra* (53 *N. J. Super.*, at *p.* 116). *Cf. State v. Miller, supra* (64 *N. J. Super.*, at *p.* 270).

 We finally come to the critical matter of the effect to be given by a court under the statute to a properly admitted reading of 0.15 per cent of alcohol in the blood. Our statute, and the Uniform Act, says that "it shall be presumed" therefrom "that the defendant was under the influence." The statutes of some other states speak of the reading as *"prima facie"* proof. The difference is not particularly significant. What was clearly intended by both expressions, in the light of the scientific knowledge of what such a reading portends physiologically which we have previously outlined, is a legisla-

tive determination that the State has proved its case by such a reading alone, which not only is sufficient to require a denial of a defense motion at the end of the prosecution's case, but remains for weighing (with, of course, any other evidence introduced by the prosecution) against the rebutting evidence introduced by the defendant. The presumption is not conclusive since contradicting evidence is expressly permitted and the statute does not make it an offense simply to operate a motor vehicle when a chemical test shows 0.15 per cent or more of alcohol in the blood of the driver. But, as a practical factual matter, it is exceedingly strong in view of the state of scientific knowledge, and in the light of the statutory scheme grading the effect of various blood alcohol concentrations. It is safe to say that such a reading is most difficult to overcome.

The magistrate here, despite his finding that the drunkometer test was properly administered, said that he did not find the reading sufficient, standing alone, to prove guilt beyond a reasonable doubt. We have difficulty understanding this conclusion in the light of what we have already said. The judge may have thought corroboration to be necessary to maintain the strength of the presumption. Such a view would not be correct. Although corroborating evidence of objective symptoms would ordinarily be available, because police do not solicit the test ordinarily unless they see something indicating probable, or at least possible, driving under the influence, and good tactics would dictate prosecution presentation of all such additional evidence, it cannot be required as necessary for a conviction.

The Appellate Division, too, did not give the statutory declaration the intended and required strength. It spoke, wrongly we believe, of the significance of evidence corroborating the result of the drunkometer test and went on to find the presumption completely overcome by a portion of the objective-symptoms testimony which it considered favorable to the defendant. Apart from the matter of the court's incorrect approach to the scope of its review which we have previously

discussed, this is not proof sufficient as a matter of law to overcome the effect of a reading of 0.18 per cent when under the state of scientific knowledge it is apparently universally conceded that *every person* with that much alcohol in his blood is under the influence for purposes of driving a motor vehicle.

The defendant makes the further contention that, even if the conviction is sustained, the case should be remanded to the County Court for resentencing. The point asserted is that that tribunal believed a sentence of imprisonment to be mandatory, the imposition or execution of which it could not suspend, and it is urged the view is an erroneous one. The judge did say "that this was not the kind of case that in my judgment required a prison sentence" but felt controlled by legislation.

There can be no doubt, and defendant does not argue otherwise, that, on the face of and in the light of the legislative history of *N. J. S. A.* 39 :4–50, imprisonment was intended to be mandatory on conviction for the second and all subsequent violations thereof. Rather the contention is that such effect is nullified by other statutory provisions.

The further thought is suggested that legislation prescribing mandatory sentences invalidly impinges upon an inherent judicial power to suspend the imposition or execution of sentences. It is clear that, before and quite apart from statutory authority, New Jersey courts did exercise what they considered to be an inherent power to suspend the imposition or execution of sentences of imprisonment upon a conviction for crime. See *Adamo v. McCorkle,* 13 *N. J.* 561 (1953). The present existence or extent of any inherent power has now become largely academic by reason of the adoption of probation statutes and the suggestion that a state legislature cannot validly remove any that remains by mandatory sentence provisions in particular situations is of doubtful merit. See the federal view, *Ex parte United States,* 242 *U. S.* 27, 37 *S. Ct.* 72, 61 *L. Ed.* 129 (1916) ; *Affronti v. United States,* 350 *U. S.* 79, 76 *S. Ct.* 171, 100 *L. Ed.* 62 (1955) ; *Lathem v.*

*United States,* 259 *F.* 2*d* 393 (5 *Cir.* 1958) ; *Smith v. United States,* 284 *F.* 2*d* 789 (5 *Cir.* 1960). We certainly think that power cannot successfully be questioned at least with respect to the type of offense here involved and in view of the short term of imprisonment required. In any event, defendant's prime argument revolves rather around the construction of present probation legislation.

Our present probation statute, *N. J. S.* 2A :168–1, had its origin in the general revision of the law on that subject by *L.* 1929, *c.* 156, § 1, which provided at that time :

"The courts of New Jersey having jurisdiction over criminal or quasi-criminal actions, when it shall appear that the best interests of the public as well as of the defendant will be subserved thereby, shall have power after conviction or after a plea of guilty or non vult for any crime or offense, to suspend the imposition or execution of sentence, and also to place the defendant on probation under the supervision of the chief probation officer of the county for a period of not less than one year nor more than five years. * * *"

In 1931 a paragraph was inserted in the motor vehicle law, *L.* 1931, *c.* 171, § 12, *p.* 376, which is now found in substantially the same form in *N. J. S. A.* 39 :5–7. It presently reads :

"In any proceeding instituted pursuant to the provisions of this subtitle, *except where a mandatory penalty is fixed herein,* the magistrate may suspend the imposition or execution of sentence, and may also place the defendant on probation under the supervision of the chief probation officer of the county for a period of not less than six months nor more than one year. The probation shall be effected and administered pursuant to the provisions of sections 2A :168–1 to 2A :168–13 of the New Jersey Statutes." (Emphasis supplied)

The legislative history does not indicate whether the 1929 general probation law was thought not to apply to motor vehicle offenses or whether the 1931 section was enacted to limit the generality thereof so that it would at least not be applicable where the motor vehicle law specified a mandatory penalty (the "driving under the influence" section so provided at that time) since the probation act then contained no

such restrictive language. At any rate, the specific 1931 motor vehicle law provision controlled the general probation act in this respect, cf. *United States v. Donovan*, 242 *F.* 2d 61, 64 (2d *Cir.* 1957), and there can be no doubt that today a magistrate is governed thereby and may not suspend the imposition or execution of any mandatory sentence prescribed by *Title* 39 of the *Revised Statutes.*

The defense argues, however, that *N. J. S. A.* 39:5–7 does not control the sentencing power of the County Court when it convicts for a motor vehicle violation on a *de novo* appeal from the Municipal Court. It further points out that, while *N. J. S.* 2A:168–1 was amended by *L.* 1952, *c.* 267, to except narcotics convictions as specified by *Chapter* 18 of *Title* 24 from the power to suspend sentence and place on probation, the generality of the original power was precisely limited only in this respect and remains in motor vehicle appeal cases. Regardless of whether the 1952 amendment was necessary to preserve the imprisonment sentences for narcotic crimes specifically and mandatorily prescribed by sections of *Title* 24 adopted the same year and irrespective of the matter of legislative power so to prescribe, on both of which questions we express no opinion here, we think defendant's point is without merit. Obviously it is still a motor vehicle offense which the County Court is determining on the *de novo* appeal and that court, insofar as penalty is concerned, is controlled by the same law which governs a magistrate. *Cf. State v. Elliott*, 13 *N. J. Super.* 432 (*App. Div.* 1951). We cannot divine any legislative intent otherwise, when it has spoken so plainly and positively as to the penalty that must be suffered for a second violation of *N. J. S. A.* 39:4–50.

The judgment of the Appellate Division is reversed and that of the County Court reinstated.

*For reversal* — Chief Justice WEINTRAUB, and Justices JACOBS, PROCTOR, HALL, SCHETTINO and HANEMAN—6.

*For affirmance*—None.