**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3517-23
               A-3522-23

STATE OF NEW JERSEY,

      Plaintiff-Appellant,

v.

KE WANG,

      Defendant-Respondent.

_____

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

KE WANG,

      Defendant-Appellant.

_____

        Argued February 27, 2025 – Decided March 17, 2025

        Before Judges Natali and Vinci.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 23-06-0080.

Sarah D. Brigham, Deputy Attorney General, argued the cause for appellant in A-3517-23 and respondent in A-3522-23 (Matthew J. Platkin, Attorney General, attorney; Sarah D. Brigham, of counsel and on the briefs).

Joel S. Silberman argued the cause for respondent in A-3517-23 and appellant in A-3522-23.

PER CURIAM

On leave granted, the State appeals from the May 20, 2024 order granting defendant Ke Wang's motion to suppress child sexual abuse material (CSAM) and related items seized from his residence pursuant to a warrant. Defendant appeals from the same order denying his motion to dismiss the indictment based on an alleged Brady[1] violation. We consolidated the appeals for the purpose of issuing a single opinion. Because the court's decision was premised, in part, on a material mistake of fact, we vacate the order and remand for reconsideration.

In September 2021, Detective Anthony Eggert of the New Jersey State Police Internet Crimes Against Children (ICAC) unit began an investigation into the distribution of CSAM from an IP address associated with 132 Tuers Avenue,

---

[1] Brady v. Maryland, 373 U.S. 83 (1963).

Jersey City. The owner of the property, Jean Hiedrich, was the registered subscriber. The U.S. Postal Inspector's Office advised Detective Eggert two individuals received mail at 132 Tuers, and a Motor Vehicle Commission inquiry showed five individuals potentially resided at the address.

Detective Eggert's surveillance of 132 Tuers revealed it was part of a two-family, three-story residential housing unit that appeared to be divided vertically, with a front door on the left bearing the number "132," and a front door on the right bearing the number "130." Detective Eggert applied for a search warrant for 132 Tuers and included the following description of the structure:

> The residence to be searched [is] the left side of a two family, three-story home, divided vertically. The house consists [of] light gray siding. There is a brick front porch leading to both doors of the residence. When facing from the street, address 132 Tuers . . . would be the left door and 130 [Tuers] is the right door. . . . The back of the residence has a wood porch on the ground level with a door and large window covered by a metal guard.

The court granted the search warrant, which included Detective Eggert's description of 132 Tuers. The scope of the warrant, therefore, expressly included the area on the third floor of the structure associated with 132 Tuers.

A-3517-23

Unbeknownst to law enforcement, defendant rented an illegal, unmarked apartment on the third floor of the structure. The third floor is only accessible through a door located on a second-floor landing on the left side of the structure. That door and the stairs to the third floor face the left side of the structure, away from the right side of the structure where law enforcement believed 130 Tuers was located. The door to the third floor is accessible from a rear stairway leading from the back door of the structure or through a door located on the left side of the kitchen of 132 Tuers. There is no way to access the third floor from 130 Tuers.

On November 5, members of the NJSP ICAC unit and Technical Emergency and Mission Specialists (TEAMS) unit executed the search warrant. Detective John Barnett was a member of the TEAMS unit security team.[2] The security team secured the property's perimeter while the breach team performed the knock and announce and breached the front door of 132 Tuers.

Upon entering the residence, officers ascended a stairwell to the second floor. The second floor is comprised of a hallway, bedrooms, bathrooms, and a

[2]  The TEAMS unit divides its members into separate teams and each team is responsible for completing certain tasks. The security team secures the perimeter, the breach team performs the initial and any subsequent breaches, and the entry teams clears the property of any danger.

kitchen at the rear of the structure. In the kitchen, there is a door that faces the left side of the structure and opens onto a stairwell landing. The door from the kitchen was unlocked.

Across the landing from the kitchen door, there is another interior door that also faces the left side of the property. This interior door did not have any identifiable markings, and it had a locking doorknob like the second-floor bedroom doorknobs. Next to the door on the landing are stairs down to the first-floor exterior door on the rear of the structure and an interior door that faces the right side of the structure.

After officers proceeded through the unlocked kitchen door, they first went down the stairs to the first floor where they observed the locked interior door that faces the right side of the structure. They did not breach this locked door because it faces to the right and they believed it was an entrance to 130 Tuers.

Officers proceeded back up the rear stairs and returned to the second-floor interior door outside the kitchen. Believing the second-floor interior door was an extension of the interior space of 132 Tuers because it faces the left side of the structure, officers breached the door and continued up the stairs to the third

A-3517-23

floor. They observed "a small kitchen in a loft," a temporary stovetop that could be "just put . . . on the table," a refrigerator, and a bathroom.

The third floor has two bedrooms, one of which was occupied by defendant. Officers opened defendant's unlocked third-floor bedroom door, and "took [him] downstairs to the second floor with the other tenants." They seized "multiple hard drives, laptops, [and] a cellphone."

Defendant moved to suppress arguing the search of the third-floor apartment exceeded the scope of the search warrant. The court conducted an evidentiary hearing at which Detectives Eggert and Barnett testified for the State. Detective Eggert testified there were no "obstructions going from the bottom floor to the top floor" and none of "the interior doors [were] locked." He also testified the second-floor interior door leading to the third-floor attic was not locked.

Detective Barnett testified the kitchen door that led to the stairwell landing was closed but unlocked. The second-floor interior door leading to the third floor had no deadbolts or identifiable markings. He described the door as being "on the opposite end of where [officers] . . . made entry." He testified officers believed the first-floor interior door at the bottom of the rear stairwell was an extension of 130 Tuers because it was "locked" and "just from [officers']

knowledge and experience on jobs, a dwelling . . . that[ is] . . . side-by-side, it was assumed [it] . . . went into 130" Tuers. He could not recall "encountering or needing to take down a door at" any point.

Defendant testified he lived at "130 Tuers Avenue, third floor" and received mail at that address. The landlord would receive his packages at 130 Tuers, and she would give them to him. Defendant had a "key . . . for the third[-]floor door" and it was "always locked." He testified officers breached the second-floor interior door leading to the third floor because "the lock was torn apart from the door," and the landlord had to fix the lock.

On January 31, 2023, after hearing oral argument, the court entered an order denying defendant's motion to suppress supported by a written opinion. The court found "[d]efendant has not provided any supporting facts to conclude the search warrant resulted in a general search of the building that contains 132 and 130 Tuers." The court determined

> the search was not unlawful. Defendant's room was in the attic accessed from the left side of the home, and it was reasonable for the police officers executing the warrant to believe [d]efendant's room was a part of 132 Tuers . . . . The police officers did not have to leave the left side of the building to get to [d]efendant's room[,] and there were no impediments or obstacles to get to [d]efendant's room in the attic. Moreover, the officers could not have known the interior layout of the home. While [d]efendant argues that there was a door to the

third floor that led to the attic . . . , there was no testimony indicating that was a separate apartment and it appears to be an interior door similar to [the second-floor kitchen] door . . . .

Defendant moved for reconsideration, arguing officers extended the search beyond 132 Tuers when they went through the second-floor kitchen door onto the landing and then breached the door to the third floor. In his supporting brief, he included diagrams of the interior of the structure prepared by counsel's "sister [who] was in architecture school." The diagrams were not "exactly to scale" but "were the best that [they] could do graphically." The court noted the diagrams "[were] helpful to help [the court] visualize."

At least one of the diagrams, however, appears to incorrectly show the door to the third floor and the stairs leading to the third floor facing the right side of the structure. In that diagram, the door on the second floor leading to the third floor appears to face the same direction as the door on the first floor officers determined they could not breach because it likely led to 130 Tuers. In fact, it is indisputable based on the photographs and videos in the record, the door on the second floor leading to the third floor faces the left side of the structure, and the door on the first floor faces the right.

On May 11, 2023, the court entered an order denying the motion supported by an oral opinion. It found the search was reasonable because officers "entered

on the left and they continued through, unobstructed, to reach . . . defendant's apartment. . . . [T]here was no new point of entry by way of either a breach or an exiting and a re-entry." The court noted the "only dispositive fact that would . . . change [the court's] opinion would be . . . if that door [leading to the third floor] was actually locked and somebody broke it."

In September 2023, defendant again moved for reconsideration arguing his expert, a retired police officer, opined officers breached the locked door to the third floor using a Halligan Tool. On December 15, 2023, the court conducted an evidentiary hearing at which Detective Barnett, Detective Joseph Villalta-Moran, and Hiedrich testified. Detective Barnett again testified the door to the third floor was closed but unlocked.

Detective Villalta-Moran testified that on the day of the search he was called to decide whether the officers could proceed up to the third floor from the second floor. He gave permission to proceed through the second-floor interior door because "[w]ith our intel, based on what we knew . . . it was a two-family and it should typically include the second and the third floor." The "stairway leading down" to the first floor "led to a completely separate apartment" as it "seemed separate."

On cross-examination, Detective Villalta-Moran clarified he gave permission to proceed through the second-floor kitchen door instead of the second-floor interior door to the third floor. He testified there were notes relating to the search prepared by Detective Barnett that he did not have.

Hiedrich testified she considers 132 Tuers to be "one apartment"; meaning the second floor and third floor is "all one apartment." Her apartment, 130 Tuers, is located exclusively on the first floor, and there is no access to the third floor from 130 Tuers. Instead, the third floor can only be accessed by going through (1) the rear exterior door and walking up the rear-stairwell or (2) the second-floor kitchen door. Her rental agreement with defendant for the third floor was an unregistered, illegal lease, and "there would[ not] have been any notification to the State or . . . [c]ity that somebody was living there."

Following the December 15 hearing, the State obtained Detective Barnett's notes and produced them to defendant on January 4, 2024. The notes state "[c]loset door outside kitchen was breached. No indication it was separate from the residence. Door led to [third-]floor loft." The notes also include diagrams of the second and third floor confirming the door leading from the second floor to the third floor is located on the left side of the structure and faces

to the left.  On January 6, defendant moved to dismiss the indictment contending the late production of the notes was a Brady violation.

On May 20, 2024, after hearing oral argument, the court entered an order denying defendant's motion to dismiss and granting his motion to suppress supported by a written opinion.  The court found the State's failure to turn over Detective Barnett's notes was a Brady violation.  It found the State suppressed Detective Barnett's notes and they are favorable to defendant because the court previously stated a fact that would make a difference is "whether the door was locked and [officers] broke into it."  The court also found the "notes are at the very least impeachment material as [d]efendant would be able to cross-examine [Detective] Barnett on the differences between his testimony and his own notes."

The court found the notes were material because

> [a]s the TEAMS unit is going through the structure[,] they are proceeding through unlocked doors.  At the point in question, they are clearly on the other side of the structure (the right side of the house) and are faced with two locked doors.  The first is on the stairs going down which they determine is not part of the warrant, the second, without further inquiry, is determined to be a part of the warrant.  At that point, a breach of entry is made.

The court concluded "dismissal of the [i]ndictment is not warranted.  The [c]ourt cannot say that the conduct was willful or outrageous.   . . . [But

c]onsidering the palpable negligence in this case, [d]efendant must have a remedy. Therefore, [d]efendant's [m]otion to suppress must be granted."

The court also concluded the search of defendant's third-floor bedroom was outside the lawful bounds of the search warrant because

> [t]he TEAMS unit first proceeded down the stairs where they came to a locked door. The TEAMS unit did not breach this locked first-floor door as it was assumed to be 130 Tuers and thus outside the lawful bounds of the search warrant. The TEAMS unit next proceeded back up the stairs to the second-floor landing where the door to [d]efendant's third[-]floor apartment was locked and then breached. The [c]ourt notes that the doored staircase leading from the second to the third floor was on the opposite side (right side) of the dwelling from the front door of 132 Tuers.

> Both the first-floor door and the door to [d]efendant's third[-]floor apartment were locked and did not have any identifiable markings. Both appeared to be on the other side of the dwelling from the front door of 132 Tuers. Yet, the TEAMS unit declined to breach the first-floor door, but then proceeded to breach the door to [d]efendant's third[-]floor apartment with no additional inquiry. This [c]ourt questions why the first-floor door, with no identifiable markings, was not breached and [d]efendant's third-floor door, also with no identifiable markings, was breached. Therefore, the [c]ourt finds that when the TEAMS unit reached the locked door to [d]efendant's third-floor apartment, a further inquiry was necessary to determine whether the door was within the bounds of the search warrant.

On appeal, the State raises the following points for our consideration.

12

POINT I

THE OFFICERS PROPERLY EXECUTED THE
SEARCH WARRANT BASED ON THEIR
REASONABLE BELIEF THAT THE UNMARKED
INTERIOR DOOR TO THE THIRD FLOOR, FACING
FURTHER INTO THE LEFT SIDE, WAS PART OF
132 TUERS . . . , THE LOCATION TO BE
SEARCHED UNDER THE WARRANT.

A.   The police's execution of the search warrant was
reasonable in light of the facts known to them at
the time they acted.

B.   The judge not only erred by making a clearly
mistaken fact-finding that the door to the third
floor was on right side of the building, but also
for penalizing the State—by quashing all its
evidence seized pursuant to a warrant—as a
penalty for inadvertently delayed discovery.

Defendant raises the following point on appeal.

POINT I

THE TRIAL COURT ABUSED ITS DISCRETION IN
DENYING [DEFENDANT'S] MOTION TO DISMISS
FOR THE STATE'S EGREGIOUS [BRADY]
VIOLATION.

An appellate court reviewing a motion to suppress or a motion to dismiss

based on an alleged Brady violation must uphold the factual findings underlying

the trial court's decision so long as those findings are "supported by sufficient

credible evidence in the record." State v. Elders, 386 N.J. Super. 208, 228 (App.

13

Div. 2006), aff'd in part, 192 N.J. 224 (2007) (citing State v. Locurto, 157 N.J. 463, 474 (1999)); see, e.g., State v. Slockbower, 79 N.J. 1, 13 (1979) (concluding "there was substantial credible evidence to support the findings of the motion judge that the . . . investigatory search [was] not based on probable cause"); State v. Alvarez, 238 N.J. Super. 560, 564 (App. Div. 1990) (stating the standard of review on appeal from motion to suppress is whether "the findings made by the judge could reasonably have been reached on sufficient credible evidence present in the record" (citing State v. Johnson, 42 N.J. 146, 164 (1964))).

An appellate court should not disturb the trial court's findings merely because "it might have reached a different conclusion were it the trial tribunal" or because "the trial court decided all evidence or inference conflicts in favor of one side" in a close case. Johnson, 42 N.J. at 162. A trial court's findings should be disturbed only if they are so clearly mistaken "the interests of justice demand intervention and correction." Ibid. In those circumstances solely should an appellate court "appraise the record as if it were deciding the matter at inception and make its own findings and conclusions." Ibid.

We are convinced the court mistakenly determined the second-floor door that leads to the third-floor apartment defendant rented is on the right side of the

14

structure, and this factual error was material to the court's decision on both motions. In its decision, the court found the door to the third floor is on the right side of the structure and questioned how the officers could conclude the door on the first floor led to 130 Tuers and was outside the permissible scope of the warrant while the second-floor door to the third floor was not.

There is no legitimate dispute based on the photographs and videos in the record the second-floor door leading to the third floor is on the left side of the structure and faces the opposite direction of the first-floor door the officers determined likely led to 130 Tuers. Notably, this is precisely the conclusion the court reached in its January 31, 2023 opinion denying the motion to suppress and May 11, 2023 opinion denying defendant's first motion for reconsideration. Although it is not readily apparent why the court mistakenly concluded otherwise in its May 20, 2024 opinion, the error may have been caused by the misleading diagrams defendant created that incorrectly depict the second-floor door and stairs to the third floor facing the right side of the structure.

Because the factual error was material to the court's decision on both motions, we are required to vacate the May 20, 2024 order and remand for reconsideration.

We do not intend to express any opinion on the merits or appropriate resolution of the motions. However, in addition to the fact the access door and stairs to the third floor are on the left side of the structure, the court should consider the following facts on remand. The scope of the warrant included the area of the structure on the third floor that was part of 132 Tuers. Hiedrich testified the illegal apartment on the third floor was part of 132 Tuers, not her first-floor apartment, 130 Tuers. 130 Tuers is located exclusively on the first floor and there is no access to the third floor from 130 Tuers. Because it was an illegal, unregistered apartment, there was no way for law enforcement to know Hiedrich created a separate apartment on the third floor. The officers entered the third floor through the door leading from the second-floor kitchen that is unquestionably part of 132 Tuers. And, the door to the third floor was unmarked and similar to the other doors on the second floor.

Vacated and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Hadley

Clerk of the Appellate Division

A-3517-23