NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-2878-15T1

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

RAYMOND C. GRAVATT, JR.,

 Defendant-Appellant.
__________________________________

 Argued May 24, 2017 – Decided July 13, 2017

 Before Judges Accurso and Lisa.

 On appeal from Superior Court of New Jersey,
 Law Division, Ocean County, Accusation No. 13-
 01-00146.

 Thomas Cannavo, argued the cause for appellant
 (The Hernandez Law Firm, P.C., attorneys; Mr.
 Cannavo, of counsel and on the brief).

 John C. Tassini, Assistant Prosecutor, argued
 the cause for respondent (Joseph D. Coronato,
 Ocean County Prosecutor, attorney; Samuel
 Marzarella, Chief Appellate Attorney, of
 counsel; Mr. Tassini, on the brief).

PER CURIAM
 Defendant, Raymond C. Gravatt, Jr., was the driver of a

vehicle involved in a two-car accident at 12:11 a.m. on May 7,

2011. Defendant was seriously injured, as were the three occupants

of the other vehicle. Defendant was charged with driving while

intoxicated (DWI), N.J.S.A. 39:4-50. He was also charged in an

accusation with three counts of third-degree assault by auto by

recklessly driving a vehicle in violation of N.J.S.A. 39:4-50 and

causing serious bodily injury to each of the three occupants in

the other vehicle. N.J.S.A. 2C:12-1c(2).

 Following the accident, defendant was taken to a hospital for

medical treatment. The police obtained a blood draw from him

without his consent and without the issuance of a search warrant.

Evidence of defendant's blood alcohol content (BAC) derived from

this blood draw was used as evidence against him. Defendant does

not dispute that probable cause existed for a blood draw or that

the blood was drawn in a medically reasonable manner and within a

reasonable time after his operation of the vehicle.

 Defendant moved to suppress evidence of his BAC derived from

the warrantless blood draw. He contended the State failed to

prove that sufficient exigent circumstances existed to allow the

blood draw to be conducted without the prior issuance of a warrant.

After an evidentiary hearing on December 4, 2013, Judge James M.

 2 A-2878-15T1
Blaney issued a written decision on December 5, 2013, denying

defendant's motion.

 In denying the motion, the judge applied the principles

enunciated by the United States Supreme Court in Missouri v.

McNeely, ____ U.S. ____, 133 S. Ct. 1552, 185 L. Ed. 2d 696

(2013), which had been decided on April 17, 2013. In that

decision, the Court made clear that probable cause that a driver

had consumed alcohol and may have been driving while intoxicated,

and the resulting natural metabolism of alcohol in the bloodstream,

standing alone, does not constitute a per se exigent circumstances

exception to the warrant requirement; instead, it is a factor to

be considered in a totality of circumstances test. Id. at ____,

133 S. Ct. at 1568, 185 L. Ed. 2d at 715.

 On May 4, 2015, the New Jersey Supreme Court decided State

v. Adkins, 221 N.J. 300 (2015), in which it held that McNeely must

be followed in New Jersey under the Supremacy Clause of the United

States Constitution, and it should be given pipeline retroactivity

to cases such as this one, where the blood draw was conducted

prior to McNeely and the case is still under direct review. Id.

at 313. The Court also set forth guidelines to be followed by

courts considering suppression motions in these pipeline cases.

Id. at 317.

 3 A-2878-15T1
 On June 4, 2015, defendant moved for reconsideration of the

denial of his suppression motion based upon the guidelines set

forth in Adkins. The parties appeared before Judge Blaney on July

7, 2015. Both counsel advised the court that they did not wish

to produce any further testimony or other evidence to supplement

the record that had already been established in the evidentiary

hearing initially conducted on the suppression motion. After

hearing oral argument, the judge denied the reconsideration

motion. In a brief supplemental oral opinion, he stated that in

his prior decision he had applied all of the factors required by

McNeely and, even though the New Jersey Supreme Court had not yet

decided Adkins at that time, his analysis complied with the

guidelines which Adkins later prescribed.

 On December 1, 2015, defendant pled guilty to all of the

charges. He was sentenced on February 19, 2016, to three years'

probation on the three indictable offenses, together with

forfeiture of his employment as a corrections officer, a $500

fine, and all mandatory assessments and penalties. For DWI,

defendant received a three-month driver's license suspension and

was ordered to pay all mandatory fines and penalties.

 Defendant now appeals the denial of his suppression motion

and reconsideration motion. He argues:

 4 A-2878-15T1
 THE LAW DIVISION ERRED IN DENYING THE
 RECONSIDERATION MOTION AND FINDING EXIGENT
 CIRCUMSTANCES TO JUSTIFY A WARRANTLESS SEARCH
 OF DEFENDANT'S BLOOD PURSUANT TO MISSOURI V.
 McNEELY AND STATE V. ADKINS.

We reject defendant's argument and affirm.

 The accident happened in a rural area on Route 539 in Little

Egg Harbor Township (LEH). The State's sole witness at the

suppression hearing was Sergeant Scott A. Nino, a twenty-one-year

veteran of the LEH Police Department. Nino served as the traffic

safety investigator and traffic safety sergeant in the department.

He was not on duty when the accident happened. At the time of the

accident, only four LEH officers were on duty. An off-duty member

of the department, Sergeant Wallace, came upon the accident scene

by happenstance as he was driving home, and called 911. The

recorded call-in time was 12:11 a.m.

 Nino received a call at home at about 12:24. He immediately

got dressed and proceeded to the accident scene, arriving there

at about 12:33. By that time, six other officers had responded,

including Wallace, who, as we have stated, was the first person

to come upon the accident scene while he was driving home. Two

other on-duty LEH officers responded, as well as two officers from

nearby Stafford Township and one from nearby Barnegat Township.

 This was a very serious accident resulting from a head-on

collision. Initial reports indicated that there was one fatality,

 5 A-2878-15T1
which turned out not to be the case. However, all four occupants

of the two vehicles were seriously injured.

 Some of the responding officers immediately set up and staffed

detours on Route 539. Others went to assist in setting up a

landing area for medical helicopters. At the time of Nino's

arrival, all four injured parties had already been removed from

the scene by ambulances. One was transported by ambulance directly

to a hospital. The other three, including defendant, were flown

by helicopters to different hospitals in the region. Defendant

was flown to Atlantic City Medical Center Trauma Unit.

 When Nino arrived at the crash site, he was advised that

emergency medical personnel informed officers that they detected

an odor of alcohol emanating from defendant's breath while they

were treating and transporting him. It was stipulated by the

parties that this advice was given to the police at about 12:20.

 Based upon this information, Nino determined that an officer

should take a blood kit and drive to Atlantic City Medical Center

and obtain a blood draw from defendant. That medical facility was

about a thirty-five minute drive from the accident scene. Nino

had a blood kit in his car and provided it to Officer McNally, who

left the scene at about 12:35.

 With respect to defendant's injuries, personnel at the scene

informed Nino "that [defendant's] ankle -- foot was hanging off

 6 A-2878-15T1
of his leg" and "that he may have had some chest or head injuries."

It was also believed that defendant was awaiting surgery at the

hospital.

 Police records contained an entry reflecting that McNally was

still en route to the Atlantic City Medical Center at 1:16. His

exact time of arrival there is not disclosed in the record.

However, it is documented that the blood was ultimately drawn at

2:05.

 Without going through all of the details reflected in the

testimony and documentary evidence presented in the evidentiary

hearing, we summarize the activities that were taking place at the

accident scene. In addition to the detour on Route 539, personnel

at the scene also detoured traffic from Route 554. They also shut

down traffic on Stafford Forge Road.

 Calls unrelated to this accident were also coming in. Two

LEH officers had to leave the accident scene at 1:37 to respond

to a CPR first aid call. Another first aid call came in, but the

decision was made not to send anyone "because everyone was tied

up." When the two officers returned from the CPR call, they were

sent to respond to another call, regarding loud music, at 2:06.

 Officers at the scene placed a call to the Fatal Accident

Support Team (FAST), an entity composed of members of local

departments and the county prosecutor's office, which assists

 7 A-2878-15T1
local departments with serious crashes involving death or serious

bodily injury. Repeated calls were made to other off-duty officers

in an effort to obtain additional assistance needed to direct

traffic, respond to unrelated calls, and assist with the accident

scene. Some of these efforts were unsuccessful; in some cases

officers said they would come as soon as possible. At some point,

the officers who had come in from Barnegat Township and Stafford

Township had to return to their home jurisdictions, where they

were needed. The FAST unit did not promptly respond. A second

call was made to that unit at 1:10 to ascertain the status of

their expected arrival. At 2:03, Nino received a call from a

representative of the county prosecutor's office advising that the

FAST unit was on its way. At 1:17, Nino called the Criminal

Investigation Unit (CIU) to come to the scene to take photographs

and look at the scene.

 An officer was sent to Southern Ocean County Hospital with a

blood kit for the purpose of obtaining a blood draw from the driver

of the other vehicle. Records reflect that he was en route to

that medical facility at 1:17. Records further reflect that he

had arrived there by 1:51.

 Needless to say, the LEH police spent the time immediately

following this accident in a diligent and persistent effort to do

the things that were required following such a serious accident

 8 A-2878-15T1
causing serious injuries to four individuals. This included

tending to the injured, arranging for their emergency medical care

and transport to appropriate medical facilities, securing the

accident scene, conducting a thorough investigation of the

accident and recording the results, detouring traffic, calling in

outside units and agencies to assist with their specialized

expertise, and seeking to preserve critical evidence, including

obtaining blood draws from both drivers.

 They performed these tasks while severely understaffed. The

outside units did not arrive promptly, most notably the FAST unit

which would include representatives from the county prosecutor's

office who might have been of assistance in dealing with legal

matters such as advice regarding a need for a search warrant to

obtain blood draws. Additionally, officers were required to

respond to unrelated calls occurring within their jurisdiction.

 Nino provided the following testimony, explaining why neither

he nor other supervising officers at the scene sought a search

warrant before obtaining a blood draw from defendant:

 Q Now, was any request made by you or
 any other individual, to your knowledge,
 telephonically, in person or otherwise to any
 judge for a warrant to withdraw the blood from
 the defendant?
 A No, Sir.
 Q Based on everything going on that
 night, did you -- in looking back in
 retrospect sitting here now, did you have the

 9 A-2878-15T1
 ability to sit down, prepare an affidavit, get
 the --
 A No, Sir.
 Q -- number of the judge, contact an
 assistant prosecutor, get all that information
 done --
 A No.
 Q -- present it to a judge, get a
 warrant done ahead of time?
 A No, sir.
 Q As a practical matter, was that the
 procedure in place back then --
 A No, it was not.
 Q -- in May of 2011?
 A No, sir.
 Q Okay. You know that's in place now,
 correct?
 A Yes, I do.
 Q And that's since May of this year
 when the McNeely case came out?
 A That's correct.
 Q But that wasn't done back in May of
 2011?
 A Not in May of 2011. No, sir.
 Q But even if it were, given
 everything that was going on here and the
 timing involved that you just told the judge
 about, do you feel there was an appropriate
 amount of time to ask for a telephonic warrant
 or any other type of warrant?
 A No, sir, I do not.

 Under cross-examination, Nino confirmed that there was no

procedure in place in 2011 in the traffic unit for seeking

telephonic warrants. When asked how many warrants he had applied

for in 2011, he answered, "Zero." When asked about the prior

year, he answered, "None." Nino said he didn't know if the

detective division had a procedure set up, "but as far as my

protocol, no. I had nothing set up." He explained that the

 10 A-2878-15T1
detective division is separate from his traffic unit, and that he

was not aware of what the detective division does in terms of

their warrants.

 In his written decision, Judge Blaney summarized the evidence

and made his factual findings. As we previously stated, defendant

does not dispute that the police had probable cause to request a

blood draw. The sole issue before us, as it was before Judge

Blaney, is whether sufficient exigent circumstances had been

proven to justify a blood draw without a warrant under the exigent

circumstances exception to the warrant requirement.

 After discussing the facts, Judge Blaney discussed the

relevant criteria for establishing exigent circumstances, with

particular reference to Schmerber v. California, 384 U.S. 757, 86

S. Ct. 1826, 16 L. Ed. 2d 908 (1966), and McNeely. As we have

stated, at the time of his decision, the New Jersey Supreme Court

had not yet decided Adkins.

 The judge prefaced his ultimate conclusions by stating that

McNeely made clear that there is no per se exception resulting

from the natural dissipation of alcohol in an individual's blood

in cases such as these, and that the totality of the circumstances

must be assessed. The judge therefore implicitly acknowledged

that one of the circumstances, indeed the central one, was that

obtaining a blood draw promptly was necessary to preserve evidence.

 11 A-2878-15T1
He then listed the totality of the factual circumstances which,

in addition to the inherent dissipation of alcohol in the blood,

supported his conclusion that sufficient exigent circumstances

existed to justify a warrantless blood draw:

 1. This case involved life threatening and
 serious public safety issues. Four seriously
 injured motorists were involved. Three had
 to be airlifted by helicopters to area
 hospitals. Traffic had to be rerouted, and
 the accident scene had to be investigated,
 protected, and secured for evidence.

 2. There was clearly a shortage of police
 manpower because of the time of the accident,
 the extent of the injuries and the complicated
 logistics.

 3. Defendant himself had been airlifted to a
 hospital in another county. He was to have
 surgery performed and an officer had to be
 dispatched to the hospital that was
 approximately thirty-five minutes away from
 the accident by car.

 4. The blood test was taken within a
 reasonable time under all of the conditions.

 5. This accident occurred in May of 2011 and
 no procedure existed in the Little Egg Harbor
 Police Department for obtaining a telephonic
 warrant.

 When the matter again came before Judge Blaney on July 7,

2015, after our Supreme Court's May 4, 2015 decision in Adkins,

the judge denied defendant's reconsideration motion in light of

that case. As we previously stated, neither counsel wished to

supplement the record with additional evidence. Therefore, the

 12 A-2878-15T1
judge reconsidered his earlier decision based on that record and

the holding in Adkins and the guidance it provided for analyzing

McNeely pipeline cases.

 The judge was satisfied that his prior written decision

fully complied with the further principles set forth in Adkins

because he had analyzed the requirements under McNeely. He stated:

"And I find that I have considered without having had the benefit

of the Adkins decision those standards enumerated and proffered

by the Supreme Court at the present time in Adkins."

 Our review of a trial court's decision on a suppression motion

is circumscribed. We must defer to the trial court's factual

findings as long as those findings are supported by sufficient

credible evidence in the record. State v. Elders, 192 N.J. 224,

243 (2007). A reviewing court should especially "give deference

to those findings of the trial judge which are substantially

influenced by his opportunity to hear and see the witnesses and

to have the 'feel' of the case, which a reviewing court cannot

enjoy." Id. at 244 (quoting State v. Johnson, 42 N.J. 146, 161

(1964)). Those findings should only be disregarded when they are

clearly mistaken. State v. Hubbard, 222 N.J. 249, 262 (2015)

(citing Johnson, supra, 42 N.J. at 162). "A trial court's findings

should not be disturbed simply because an appellate court 'might

have reached a different conclusion were it the trial tribunal.'"

 13 A-2878-15T1
State v. Handy, 206 N.J. 39, 44-45 (2011) (quoting Johnson, supra,

42 N.J. at 162). However, a reviewing court owes no deference to

the trial court's legal conclusions or interpretation of the legal

consequences flowing from established facts. State v. Watts, 223

N.J. 503, 516 (2015).

 Applying these principles, it is clear to us that Judge

Blaney's factual findings are more than amply supported by the

record, and we defer to them. Although we owe no deference to the

judge's legal conclusion that the totality of the circumstances

made it impractical for the police to obtain a warrant before

obtaining a blood draw from defendant, we do agree with that

conclusion.

 In McNeely, the United States Supreme Court made clear the

rationale it had applied forty-seven years earlier in Schmerber:

 Our decision in Schmerber applied this
 totality of the circumstances approach. In
 that case, the petitioner had suffered
 injuries in an automobile accident and was
 taken to the hospital. While he was there
 receiving treatment, a police officer arrested
 the petitioner for driving while under the
 influence of alcohol and ordered a blood test
 over his objection. After explaining that the
 warrant requirement applied generally to
 searches that intrude into the human body, we
 concluded that the warrantless blood test "in
 the present case" was nonetheless permissible
 because the officer "might reasonably have
 believed that he was confronted with an
 emergency, in which the delay necessary to

 14 A-2878-15T1
 obtain a warrant, under the circumstances,
 threatened 'the destruction of evidence.'"

 In support of that conclusion, we
 observed that evidence could have been lost
 because "the percentage of alcohol in the
 blood begins to diminish shortly after
 drinking stops, as the body functions to
 eliminate it from the system." We added that
 "[p]articularly in a case such as this, where
 time had to be taken to bring the accused to
 a hospital and to investigate the scene of the
 accident, there was no time to seek out a
 magistrate and secure a warrant." "Given these
 special facts," we found that it was
 appropriate for the police to act without a
 warrant.

 [McNeely, supra, ___ U.S. at ___, 133 S. Ct.
 at 1559-60, 185 L. Ed. 2d at 705-06.
 (citations omitted) (alteration in
 original).]

Notably, the Schmerber Court did not elaborate on the "special

facts" upon which it rested its decision, saying nothing more than

the McNeely Court set forth in the passage quoted above.

 In McNeely, the Court discussed why there should be no per

se exception, but instead an analysis of the totality of the

circumstances, and commented: "We do not doubt that some

circumstances will make obtaining a warrant impractical such that

the dissipation of alcohol from the bloodstream will support an

exigency justifying a properly conducted warrantless blood test."

Id. at ____, 133 S. Ct. at 1561, 185 L. Ed. 2d at 707. The Court

provided an example to illustrate why a per se exception should

 15 A-2878-15T1
not be adopted, even in cases where an accident causes injury to

the suspected drunk driver, namely "a situation in which the

warrant process will not significantly increase the delay before

the blood test is conducted because an officer can take steps to

secure a warrant while the suspect is being transported to a

medical facility by another officer." Id. at ____, 133 S. Ct. at

1561, 185 L. Ed. 2d at 708.

 The Court also acknowledged the significant advances that had

transpired in the decades since Schmerber was decided allowing for

the more expeditious processing of warrant applications through

telephonic or other reliable electronic means. Id. at ____, 133

S. Ct. at 1561-63, 185 L. Ed. 2d at 708-09. Along these lines,

New Jersey has adopted a Rule authorizing telephonic warrants upon

compliance with a set of specific procedures. R. 3:5-3(b).

 However, the Court went on to acknowledge that the

availability of a telephonic warrant procedure does not create a

panacea eliminating the need for warrantless searches when time

is of the essence to preserve evidence, in cases like this one:

 We by no means claim that
 telecommunications innovations have, will, or
 should eliminate all delay from the warrant-
 application process. Warrants inevitably take
 some time for police officers or prosecutors
 to complete and for magistrate judges to
 review. Telephonic and electronic warrants
 may still require officers to follow time-
 consuming formalities designed to create an

 16 A-2878-15T1
 adequate record, such as preparing a duplicate
 warrant before calling the magistrate judge.
 See Fed. Rule Crim. Proc. 4:1(b)(3). And
 improvements in communications technology do
 not guarantee that a magistrate judge will be
 available when an officer needs a warrant
 after making a late-night arrest.

 [Id. at ____, 133 S. Ct. at 1562, 185 L. Ed.
 2d at 709.]

 The Court went on to note that although the facts in the

McNeely case might be categorized as a "routine DWI case," even

in such a case that

 does not involve "special facts," such as the
 need for the police to attend to a car
 accident, does not mean a warrant is required.
 Other factors present in an ordinary traffic
 stop, such as the procedures in place for
 obtaining a warrant or the availability of a
 magistrate judge, may affect whether the
 police can obtain a warrant in an expeditious
 way and therefore may establish an exigency
 that permits a warrantless search.

 [Id. at ____, 133 S. Ct. at 1568, 185 L. Ed.
 2d at 714 (citation omitted).]

 Thus, McNeely instructs that there is no per se exception,

that additional special facts must be present, and those additional

special facts, combined with the fact of inherent dissipation,

must make it impractical for the police to have time to obtain a

warrant to avoid the destruction or compromise of the evidence

sought, namely a blood draw to determine the BAC of a driver as

close in time as possible to the time of operation. These special

 17 A-2878-15T1
facts may include procedures in place for obtaining a warrant,

which we take to mean the time required to comply with those

procedures or, by implication, the absence of such procedures.

 In Adkins, the New Jersey Supreme Court held that pipeline

retroactivity must be applied to McNeely for blood draws that

occurred before McNeely was decided in cases that were still active

in the trial court or on direct appeal. Adkins, supra, 221 N.J.

at 313. In McNeely, the United States Supreme Court noted a broad

split of opinion among the states as to whether Schmerber had

authorized a per se exception. McNeely, supra, ___ U.S. at ____,

133 S. Ct. at 1558, 185 L. Ed. 2d at 703-04. Although New Jersey

courts never expressly announced that Schmerber authorized a per

se exception, significant New Jersey "case law contains language

that provides a basis for such a belief." Adkins, supra, 221 N.J.

at 316. The Adkins Court provided a number of examples. Ibid.

Accordingly, the Court "accept[ed] that our case law played a

leading role in dissuading police from believing that they needed

to seek, or explaining why they did not seek, a warrant before

obtaining an involuntary blood draw from a suspected drunk driver."

Id. at 317.

 In light of that background, the Court laid down some

guidelines to be applied in the totality-of-the-circumstances

analysis in these pipeline cases. Ibid. Among these are that

 18 A-2878-15T1
"the exigency in these circumstances should be assessed in a manner

that permits the court to ascribe substantial weight to the

perceived dissipation that an officer reasonably faced." Ibid.

Further, reviewing courts should "focus on the objective exigency

of the circumstances that the officer faced," recognizing that the

"police may have believed that they did not have to evaluate

whether a warrant could be obtained, based on prior guidance from

our Court that did not dwell on such an obligation." Ibid.

 Applying the principles enunciated in McNeely and Adkins, we

are firmly convinced that the additional "special facts" in this

case, combined with the inherent fact of natural dissipation of

alcohol in an individual's blood, provided a totality of

circumstances justifying a warrantless search. The police here

were grossly understaffed in dealing with this very serious

accident. They acted reasonably and expeditiously in trying to

bring in additional manpower to assist in doing all that needed

to be done. Defendant had been promptly flown from the scene to

a suitable medical facility, where he was awaiting surgery for his

very serious injuries. The police could not wait until his surgery

was completed, both because of time and because his BAC might have

been distorted through the surgical process.

 Unlike the example the United States Supreme Court provided

in McNeely, there was no "other" officer available who could simply

 19 A-2878-15T1
obtain a telephonic warrant while McNally was driving to Atlantic

City to obtain the blood draw. All officers were tasked beyond

their capacities in dealing with the accident scene and other

required police work.

 Further, no procedures were in place for the traffic unit in

the LEH Police Department to seek telephonic warrants. This was

recognized as a justifiable consideration in McNeely, as well as

in Adkins. Our acknowledgment of this circumstance does not

constitute application, in whole or in part, explicitly or

implicitly, of a good faith exception, which our Supreme Court has

rejected. See State v. Novembrino, 105 N.J. 95 (1987). However,

the absence of procedures in 2011 is a fact, and it is appropriate

to consider it as one of the "special facts" in the totality of

the circumstances calculus.

 Further, the diligent efforts of the local police to bring

in specialized units were met with delays. Notably, the FAST unit

would have included representatives of the county prosecutor's

office, who would have been equipped to provide legal guidance on

the potential need for a search warrant. Their absence until

after the blood draw was actually performed is another fact to be

considered, the fault for which cannot not be laid at the feet of

the local police.

 20 A-2878-15T1
 Finally, of course, is the substantial weight that should be

ascribed to the perceived dissipation faced by Nino and the other

LEH officers in this case. This is particularly significant

because of the very serious nature of the case, involving very

serious injuries, the potential for a fatality, and the serious

criminal consequences that could (and did) result.

 As expressed in Schmerber, this was a case in which Nino and

his fellow officers "might reasonably have believed that [they

were] confronted with an emergency, in which the delay necessary

to obtain a warrant, under the circumstances, threatened 'the

destruction of evidence.'" Schmerber, supra, 384 U.S. at 770,

86 S. Ct. at 1835, 16 L. Ed. 2d at 919-20 (citation omitted). The

exigency existing under the totality of circumstances here

rendered impractical the obtaining of a warrant in time to prevent

the dissipation of alcohol from defendant's bloodstream, thus

justifying the warrantless blood draw.

 Affirmed.

 21 A-2878-15T1