**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3753-14T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

RICO PARKS a/k/a JAMES R. PARKS,
JAMEEL PARKS, PARKS JAMES,
JAMEEL PARTLOW, JAMES R. PARTOW,
RICCIO J. PARK, ERIC R. PARKS,
ERIC PARK, REO PARKS, REKO PARKS,
RECO PARKS JR., RECO J. PARKS,
RICO J. PARKS, PARKS R. JAMES,
RECO PARKS,

    Defendant-Appellant.

---

Submitted June 1, 2017 — Decided July 31, 2017

Before Judges Alvarez and Manahan.

On appeal from the Superior Court of New
Jersey, Law Division, Union County, Indictment
No. 12-06-0475.

Joseph E. Krakora, Public Defender, attorney
for appellant (Brian P. Keenan, Assistant
Deputy Public Defender, of counsel and on the
brief).

Christopher S. Porrino, Attorney General,
attorney for respondent (Jenny M. Hsu, Deputy
Attorney General, of counsel and on the
brief).

PER CURIAM

Tried by a jury, defendant Rico Parks was convicted of first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2), and third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d). He was sentenced on February 20, 2015, to life subject to the No Early Release Act's eighty-five percent parole ineligibility, see N.J.S.A. 2C:43-7.2, and a concurrent five-year term on the possession of a weapon offense. Defendant now appeals, contending that his videotaped confession should have been suppressed, and that the judge improperly included aggravating factors in his sentencing decision. We disagree and affirm.

During the trial, the jury heard first from William Cook, the uncle of the victim Thya Wilson, who was defendant's wife. Cook lived with defendant and Wilson. He testified that on January 3, 2012, a Tuesday, defendant left for work at his normal time around 7:00 p.m.; the victim had not yet returned home. Cook was already in bed at 11:00 p.m. when he heard the victim's keys rattling, and heard her coming through the door and walking down the hallway. She went into her bedroom, to the kitchen, and then back to the bedroom. Although Cook did not see or speak to Wilson, he was certain she was in the apartment because of the sound of her keys.

In the middle of the night, Cook awakened to the sound of Wilson's voice saying, "I'm sorry, I'm sorry." Cook said it

sounded as if she was crying, and as if someone was "gettin[g] hit with a belt about three times." Cook was cross-examined on an earlier statement he had made in which he acknowledged the possibility the sound may have originated from "upstairs over" him. He did not get up to investigate because he thought Wilson was speaking on the phone. Cook went back to sleep, awakening the following morning at around 8:00 a.m. when defendant asked if he wanted anything from the store. Defendant and Cook remained in the apartment all day.

Cook noticed that Wilson's car was parked outside. When he looked into her bedroom he observed that it was clean, which was unusual for her because she normally kept it "messy," and never made her bed. Defendant made no efforts to reach Wilson. Cook tried to call Wilson four times, but only reached her voicemail.

By Thursday morning, Cook was becoming concerned because ordinarily when Wilson did not return home, she would reach out to him. Defendant behaved normally that Thursday, except that Cook noticed defendant left briefly with Wilson's vehicle. They stayed home that night and watched television. Defendant did not look for Wilson on Thursday.

On Friday morning, Cook was awakened by defendant telling him that Wilson was outside. When Cook went to the door, he saw his niece lying on the floor.

Neighbors had contacted police to report a body in the hallway. When they arrived, defendant identified the body as his wife.

One of the residents in the building said that on Tuesday, January 3, 2012, around 7:45 p.m., as she was walking back into the building, she saw someone with a ski mask on. As she entered the building, she recognized that it was defendant from his voice.

Wilson's son-in-law also testified for the State. He said that Wilson and his wife, Wilson's daughter, were very close and spoke daily. He learned Wilson was missing on Wednesday from his wife, and after he left work in the afternoon, they went to the apartment. The son-in-law and his wife looked around for ten to fifteen minutes while defendant remained in the living room. They looked in the closets, under the bed, and in the bathroom. The bedspread on Wilson's bed at the time police photographed her bedroom was different from the one he recalled her using. The son-in-law testified that it was peculiar that her bedroom was neat since normally she kept it "really disheveled and jumbled around and stuff." When he checked the bedroom closet, he could see nothing inside because there was a "wall of bags[.]" Defendant did not join them as they searched the apartment.

A representative from defendant's employer also testified. He said that on Tuesday, defendant called and said he was unable

4

to work. On Thursday, he received a call from defendant asking if he could pick up his check. Defendant also asked if he could defer returning to work until Sunday because his wife was missing and he needed to look for her.

Another neighbor testified that on Thursday defendant helped him work on his van from 11:00 a.m. until 6:00 p.m. Throughout the day, defendant acted normally and did not mention that his wife was missing. When the neighbor found out about it later in the day, defendant did not respond to his questions.

Investigators examined the scene with luminal spray, locating blood traces on the victim's bedroom floor. Sergeant Frank Coon of the Union County Sheriff's Department, said that when he opened the victim's bedroom closet he smelled a foul odor he identified with death. He saw a "sharp instrument, a knife," on the floor under a dresser in the bedroom. It was part of a set found in the kitchen.

A DNA forensic expert and chemist with the Union County Prosecutor's forensic laboratory identified blood swabs taken from Wilson's dresser and the floor of the bedroom as coming from the victim. The expert could not exclude Wilson as a contributor from swabs taken from the floor of the closet, but did exclude defendant. The knife, when tested, had traces of Wilson's blood, as did the interior of a suitcase found in Wilson's bedroom closet.

5

The medical examiner testified that Wilson had died two days before the body was discovered on January 6, 2012. The cause of death was multiple blunt and sharp force injuries, and she had defensive wounds on her hands.

The day the body was discovered, defendant and Cook were driven to the local police station to be interviewed. They were initially seated together in a waiting area. Defendant was then taken to the Union County Prosecutor's Office because he had an outstanding child support warrant.

When the officers began defendant's interview at that location, they explained that he was in custody because of the civil contempt warrant. Detective William Lord of the Union County Prosecutor's Office Homicide Unit, then said: "Okay. That's why you [are] here right now and we need to speak to you about something else that occurred earlier today." Lord reviewed defendant's Miranda[1] rights with him, which he waived after acknowledging that he understood them. Defendant asked if he was being charged with anything else. Lord responded that there were no other charges at that time. Defendant agreed to speak to the detectives, and from the outset of the interview, complained about injuries to his hand.

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Lord opened the interview by stating that he was "investigating a homicide that took place and the victim was [Wilson]" and that officers were "speaking with everyone who had any contact with her within the last couple of days." Defendant said that while he had worked on Monday, he did not work on Tuesday. When he arrived home on Tuesday morning, Wilson was not there. Defendant also said the last time he saw his wife was on Sunday, that they had argued, and Wilson was not speaking to him because she thought he had stolen money from her. Defendant denied that it was strange for him not to have seen or spoken to her since Sunday, given their work schedules, and because she usually would not "speak to [him] for a while" after they had a disagreement.

Defendant mentioned that Wilson's daughter and husband had come by to look for Wilson on Wednesday night. Earlier that day, defendant had knocked on Wilson's door, and asked Cook where she was because she was "suppose[d] to be there Wednesday, that's her day off." Defendant said Cook told him he had heard her crying on Tuesday and saying, "I'm sorry," but that he had not checked on her.

Defendant initially told the police that he was out Tuesday night. He claimed that on Tuesday morning the staffing agency told him there was no work so he went to downtown Elizabeth, bought

A-3753-14T2

some alcohol, ran into a friend and got high, drove around in his friend's car, and went to a park. He did not return home until Wednesday morning. Cook was there at the time and when defendant did not see Wilson, he asked Cook where she was. Her car was parked by the apartment and he moved it after Cook asked him to.

During the interview, Lord asked defendant about his hand. Defendant said that he had injured it on Sunday lifting boxes at work and it was "locked up." Detective Jose Vendas of the Union County Prosecutor's Office Homicide Unit asked defendant if he would mind showing them his hands and commented that both looked swollen, one more than the other. A photo of defendant's swollen and bruised hand was introduced at trial.

After the officers inquired further about defendant's work schedule and the reason he had not worked after Monday, defendant said, "You [are] asking me the same question . . . . You [are] confusing -- . . . . This is harassment what you [are] doing now." The officers apologized and defendant said, "You ask me the same questions over and over again like you [are] not believing me." He then said he did not want to talk anymore because they did not believe him.

Vendas confirmed that defendant did not want to talk anymore, said it was not a problem, and indicated the time for the record. Defendant then interrupted and said, "What else ya'll wanna know?"

Lord said he would not continue the interview if defendant did not want to and that he was "not [going to] force [defendant] to talk to [them.]" Defendant said that they could continue talking.

Defendant told the officers that he sometimes slept in a different bed after an argument with Wilson. After discussing his whereabouts between Monday and Friday, the detectives informed defendant that the blood traces found in the apartment pointed to him as the perpetrator. Defendant repeatedly denied killing Wilson. He also denied failing to look for her.

Defendant told the officers, "[t]he way ya'll just asking me, like ya'll charging me." Lord responded that they had already explained why he was there. Defendant said that he was "basically" being charged and that he had known he would be charged.

At this point in the interview, Detective Jorge Jimenez of the Union County Prosecutor's Office came into the room, introduced himself, reminded defendant that he was being video-taped and explained, in very frank terms, how the "system works." He said that he did not know whether or not defendant would be charged that night but that he was giving defendant an opportunity to apologize and acknowledge that he messed up. Defendant promptly confessed, saying that he "f----d up," and that he was sorry.

On Tuesday, after Wilson returned home, defendant overheard Wilson on the phone with someone with whom he suspected she was

9

having an affair. He had previously overheard Wilson's conversations with this individual. Defendant waited until she went to bed, checked to make sure she was asleep, and "thought about it." He walked out of the bedroom and into another room, then "walked [back into] the room and clobbered her." Defendant said he "[j]ust kept punching her." Wilson fell onto her stomach and he "kept pounding her." "After a while she [] stopped moving." Defendant initially stated that he just punched her with gloved hands, but later admitted he hit her with a "metal piece" after the officers pointed out that some of Wilson's injuries did not come from being punched.

Defendant eventually dragged Wilson's body to the bathroom, undressed her, bathed her, put her clothes back on, and placed her body in a suitcase in the closet. He threw away the clothes he wore while cleaning up. The "metal piece" he used broke into "a thousand pieces," which he threw into a nearby river. He moved Wilson's body to the hallway early Friday morning, afraid that otherwise the apartment would start to smell.

During the suppression hearing, Vendas testified in addition to Elizabeth Police Department Detective Thomas Koczur. Defendant challenged the admissibility of his statement on the basis that police did not advise him that he was going to be charged with murder. Koczur testified that when police arrived at the apartment

building on January 6, defendant was on the living room couch. Defendant and Cook agreed to speak with Koczur, and within five minutes were transported to headquarters. Koczur found defendant's extremely calm demeanor unusual given that his wife's body had just been discovered outside his front door. Upon their arrival at the police station, Cook and defendant were seated in the reception area.

While defendant was waiting, Koczur learned there was an active bench warrant. Defendant was then taken into custody, handcuffed, and moved to an interview room at the Union County Prosecutor's Office.

Vendas said defendant did not sign the Miranda waiver himself because of his swollen hand, which he initially claimed he injured at work, and only later admitted he injured while punching Wilson. He never sought medical attention prior to being brought to the station, nor did he request it during the interview. Defendant was offered coffee and food. After being taken to the location where the clothes worn during the homicide were discarded, defendant was charged with murder. The clothing was not recovered. He was treated for a sprain to his right hand, although no medication was prescribed, just an ice pack.

The Law Division judge found Koczur and Vendas to be credible witnesses. He was satisfied that defendant clearly and unequivocally understood his rights and his waiver of them.

The judge considered the precedent defendant relied upon, State v. A.G.D., 178 N.J. 56 (2003), to be distinguishable because in this case no complaint or warrant had issued before defendant's interview. Defendant was in actual custody only because of the civil matter.

When the judge sentenced defendant after trial, he found aggravating factor one, the nature and circumstances of the offense, N.J.S.A. 2C:44-1(a)(1). He listed the marital relationship between defendant and the victim, the broken bond of trust, and "the brutal and senseless nature of this crime, which was followed by . . . a cover-up, such that Wilson was placed in a . . . suitcase and stored in the closet," as the reasons which supported the factor. He also found aggravating factor two, N.J.S.A. 2C:44-1(a)(2), because the victim was asleep and helpless when defendant's attack began. He noted defendant stood six foot, two inches tall and weighed 190 pounds. He further found aggravating factor three, N.J.S.A. 2C:44-1(a)(3), the risk defendant would reoffend in light of his significant criminal history and ongoing drug problem, and factor six, N.J.S.A. 2C:44-1(a)(6), as the murder conviction was defendant's eighth

12

indictable offense. His criminal history began in 1983, his parole was revoked on four occasions, and he had been arrested numerous times. Defendant's prior convictions included robbery, burglary, and drug possession. The judge included factor nine, N.J.S.A. 2C:44-1(a)(9), the need to deter, in his sentence calculus, and he found no mitigating factors.

On appeal, defendant raises the following points for our consideration:

> POINT I
>
> DEFENDANT'S WAIVER OF HIS NEW JERSEY COMMON LAW PRIVILEGE AGAINST SELF-INCRIMINATION WAS NOT VALID BECAUSE THE POLICE FAILED TO INFORM HIM THAT HE WAS THE "TARGET" OF THEIR INVESTIGATION WHEN THE POLICE ACKNOWLEDGED AT THE SUPPRESSION HEARING THAT PARKS WAS A SUSPECT AT THE START OF THE INTERVIEW.
>
> POINT II
>
> THE TRIAL JUDGE'S ERROR IN FINDING AGGRAVATING FACTORS ONE AND TWO THAT WERE NOT SUPPORTED BY THE RECORD RESULTED IN A MANIFESTLY EXCESSIVE SENTENCE.

I.

When reviewing a decision on a motion to suppress, an appellate court upholds the factual findings of the trial court when they are based upon "sufficient credible evidence in the record." State v. Elders, 192 N.J. 224, 243 (2007) (citation omitted). Deference is given to the trial court's factual findings

because of its firsthand observations of the witnesses. Id. at 244 (citing State v. Johnson, 42 N.J. 146, 161 (1964)). We do not disturb a trial court's factual findings merely because we would have reached a different conclusion. Ibid. (citing Johnson, supra, 42 N.J. at 162). However, the trial court's factual findings will be overturned if justice so demands. Ibid.

The standard of review of a trial court's sentence is "one of great deference and 'judges who exercise discretion and comply with the principles of sentencing remain free from the fear of second guessing.'" State v. McGuire, 419 N.J. Super. 88, 160 (App. Div.) (quoting State v. Dalziel, 182 N.J. 494, 501 (2005)), certif. denied, 208 N.J. 335 (2011).

## II.

Defendant asserts that the relevant law regarding the voluntariness of his confession is State v. A.G.D., 178 N.J. 56 (2003). We do not agree.

"The privilege against self-incrimination, as set forth in the Fifth Amendment to the United States Constitution, is one of the most important protections of the criminal law." State v. Presha, 163 N.J. 304, 312 (2000). Therefore, in order for a "confession to be admissible as evidence, prosecutors must prove beyond a reasonable doubt that the suspect's waiver was knowing, intelligent, and voluntary in light of all the circumstances."

14

<u>Id.</u> at 313.  A confession cannot be the product of police coercion.

<u>Ibid.</u>

> In determining whether a suspect's confession is the product of free will, courts traditionally assess the totality of circumstances surrounding the arrest and interrogation, including such factors as "the suspect's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved."
>
> [<u>Ibid.</u> (quoting <u>State v. Miller</u>, 76 <u>N.J.</u> 392, 402 (1978)).]

In our view, the relevant and dispositive case is <u>State v. Nyhammer</u>, 197 <u>N.J.</u> 383, <u>cert. denied</u>, 558 <u>U.S.</u> 831, 130 <u>S. Ct.</u> 65, 175 <u>L. Ed.</u> 2d 48 (2009).  There the Court reiterated that police must inform a suspect that a complaint or arrest warrant has been lodged. <u>Id.</u> at 404-05.  In <u>Nyhammer</u>, the defendant was not told that allegations had been made by a sexual assault victim against him.  <u>Id.</u> at 390.  At the time he spoke with police, at least initially, the defendant stated that he believed he was assisting in the investigation of another family member whom the child had also accused.  <u>Id.</u> at 389-90.  He was then questioned in a manner which was not coercive, and that was relatively brief.  <u>Id.</u> at 391-92.  The defendant acknowledged understanding his rights.  <u>Id.</u> at 390.

The Court found the defendant's inculpatory statement to be admissible, and affirmed the trial court's decision denying suppression, because:

> Unlike the issuance of a criminal complaint or arrest warrant, suspect status is not an objectively verifiable and discrete fact, but rather an elusive concept that will vary depending on subjective considerations of different police officers. A suspect to one police officer may be a person of interest to another officer.
>
> [Nyhammer, supra, 197 N.J. at 405.]

The failure to advise a suspect that he or she is a suspect is only one of several factors in applying the totality of the circumstances test when reviewing the admissibility of a statement. Id. at 407. The Court went on to say:

> [T]he failure to be told of one's suspect status still would be only one of many factors to be considered in the totality of the circumstances. We must acknowledge the reality that in many, if not most cases, the person being questioned knows he is in custody on a criminal charge. We also are mindful that the Miranda warnings themselves strongly suggest, if not scream out, that a person is a suspect, . . . . Those and the other warnings should be a sobering wake-up call to a person under interrogation. [] [T]he nature of police questioning would be another stark reminder that the person under interrogation is deemed a suspect. For example, there can be little doubt that when [the investigating officer] told defendant that [the victim] had made sexual allegations against him that he knew — at that moment — that he was a suspect in a criminal investigation.

16

[*Id.* at 407-08.]

Clearly, the officers in this case suspected that defendant might have been involved in the murder. Just as clearly, because the investigation was only beginning, everyone was a potential suspect and source of information. Police brought both defendant and Wilson's uncle into the station. Initially, neither had their freedom of movement restrained. Defendant was not taken into custody until officers learned he had an outstanding warrant.

Defendant's atypical response may have been a signal that he warranted a second look, but the investigation was not focused just on him. For that reason, the outcome here is controlled by <u>Nyhammer</u>. Applying the totality of the circumstances test, defendant's status at the beginning of the investigation was ambiguous enough that the officers' disclosures to him sufficed to guarantee that he exercised his <u>Miranda</u> rights knowingly and intelligently.

### III.

Appellate review of a sentence involves ensuring that the trial court's "exercise of discretion [is] based on findings of fact that are grounded in competent, reasonable credible evidence," and that it "appl[ied] correct legal principles in exercising its discretion." <u>State v. Roth</u>, 95 <u>N.J.</u> 334, 363

17                                                              A-3753-14T2

(1984).  Sentences should only be modified when the trial court made "such a clear error of judgment that it shocks the judicial conscience."  Id. at 364.  Aggravating and mitigating factors identify "individual circumstances which distinguish the particular offense from other crimes of the same nature."  State v. Yarbough, 195 N.J. Super. 135, 143 (App. Div. 1984), remanded for resentencing on other grounds, 100 N.J. 627 (1985), cert. denied, 475 U.S. 1014, 106 S. Ct. 1193, 89 L. Ed. 2d 308 (1986).

Although the sentencing judge took into account the relationship between the parties as a significant fact contributing to aggravating factor one, he also acknowledged the "brutal" nature of the onslaught.  The force employed by defendant, who acknowledged repeatedly striking the victim while she lay helpless on the floor, on her stomach so she could not resist, is alone appropriate evidence supporting this aggravating factor.

Similarly, aggravating factor two focuses on the circumstances that make a victim vulnerable.  Wilson was asleep when this attack began.  That is a sufficient basis for factor two.  Under the circumstances, we are satisfied that the judge correctly applied sentencing principles based on facts grounded n competent, reasonably credible evidence.  He did not err in his analysis.  The sentencing decision does not shock our conscience.

Affirmed.

18

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3753-14T2