# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2295-16T5
              A-4316-16T5

IN THE MATTER OF THE CIVIL
COMMITMENT OF H.B.,
SVP-252-02.

_____

IN THE MATTER OF THE CIVIL
COMMITMENT OF B.L.,
SVP-463-07.

_____

        Argued March 4, 2019 – Decided March 26, 2019

        Before Judges Messano, Fasciale and Rose.

        On appeal from Superior Court of New Jersey, Law Division, Essex County, Docket Nos. SVP-252-02 and SVP-463-07.

        Susan Remis Silver, Assistant Deputy Public Defender, argued the cause for appellant H.B. and B.L. (Joseph E. Krakora, Public Defender, attorney; Susan Remis Silver, on the briefs).

        Victoria R. Ply, Deputy Attorney General, argued the cause for respondent State of New Jersey (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Victoria R. Ply, on the briefs).

PER CURIAM

In these back-to-back appeals, which we have consolidated for purposes of this opinion, B.L. and H.B. appeal from orders continuing their involuntary commitment to the Special Treatment Unit (STU) as sexually violent predators under the Sexually Violent Predator Act (SVPA), N.J.S.A. 30:4-27.24 to -27.38. We reject their primary contention that the State's experts rendered net opinions and conclude that there exists sufficient credible evidence to support the judges' findings. We therefore affirm.

I.

We begin with some general legal principles governing civil involuntary commitments of sexually violent predators. Under the SVPA, the State may petition the court for the involuntary commitment of an individual believed to be a "sexually violent predator." N.J.S.A. 30:4-27.28. See also In re Commitment of W.Z., 173 N.J. 109, 112 (2002). Under N.J.S.A. 30:4-27.26, a "sexually violent predator" means

> a person who has been convicted, adjudicated delinquent or found not guilty by reason of insanity for commission of a sexually violent offense, or has been charged with a sexually violent offense but found to be incompetent to stand trial, and suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not

2

A-2295-16T5

> confined in a secure facility for control, care and treatment.
>
> [(Emphasis added).]

A "mental abnormality" means "a mental condition that affects a person's emotional, cognitive or volitional capacity in a manner that predisposes that person to commit acts of sexual violence." Ibid. And the phrase "[l]ikely to engage in acts of sexual violence" means "the propensity of a person to commit acts of sexual violence is of such a degree as to pose a threat to the health and safety of others." Ibid.

Clear and convincing proof is required for an involuntary commitment. N.J.S.A. 30:4-27.32(a). On the requisite quantum of proof, the United States Supreme Court rejected the notion that a sex offender must be unable to control completely his dangerous sexual behavior. See Kansas v. Crane, 534 U.S. 407, 413 (2002). Instead, the Crane Court held that substantive due process required some lack-of-control determination. Ibid. Mathematical precision to prove inability to control behavior is not required. Rather, there must be proof of "serious difficulty in controlling behavior." Ibid. An "absolutist" approach is "unworkable" and risks "barring the civil commitment of highly dangerous [sex offenders] suffering severe mental abnormalities." Id. at 411-12.

A-2295-16T5

Rejecting bright-line rules to ensure constitutional safeguards of human liberty when assessing mental illnesses, our Supreme Court noted that the State must have "considerable leeway in defining the mental abnormalities and personality disorders that make an individual eligible for confinement." W.Z., 173 N.J. at 125 (quoting Crane, 534 U.S. at 413). Thus, "[a] finding of mental abnormality that results in an impaired but not a total loss of ability to control sexually dangerous behavior can be sufficient" to satisfy due process. Id. at 126. A diagnosis of "sexual compulsion" is unnecessary if the State proves the requisite "serious difficulty with control." Id. at 129. It is therefore the "inability to control one's sexually violent behavior [that] is the very essence of the SVPA." Ibid.

After a person is involuntarily committed, the State must house that person in a facility separate from other types of offenders and provide "treatment tailored to address the specific needs of sexually violent predators." Id. at 120. Under N.J.S.A. 30:4-27.35, such a person is entitled to annual court hearings to assess whether continued commitment or conditional discharge is appropriate. The burden of proof for continued commitment is by clear and convincing evidence. N.J.S.A. 30:4-27.32(a). Conditional discharge is appropriate if the court finds that

the person will not be likely to engage in acts of sexual violence because the person is amenable to and <u>highly likely</u> to comply with a plan to facilitate the person's adjustment and reintegration into the community so as to render involuntary commitment as a sexually violent predator unnecessary for that person[.]

[N.J.S.A. 30:4-27.32(c)(1) (emphasis added).]

In such an instance, the court may order that the person be "conditionally discharged in accordance with such plan." <u>Ibid.</u>

## II.

In 1994, B.L. raped a fourteen-year-old girl. He pled guilty to second-degree sexual assault, N.J.S.A. 2C:14-2(c), and received a five-year prison sentence. In 1999, B.L. raped a seventeen-year old girl. He pled guilty to second-degree sexual assault, N.J.S.A. 2C:14-2(c), and received a nine-year prison term.[1] In 2007, the State petitioned the court to civilly commit B.L. as a sexually violent predator under the SVPA, and in 2008 obtained an order involuntarily committing him to the STU. Since then, either by stipulation or by court order, B.L. has remained involuntarily committed. B.L. appeals from

---

[1] We affirmed the conviction. <u>In re Civil Commitment of B.L.</u>, No. A-4036-07 (App. Div. Jan. 4, 2010). As part of the negotiated plea agreement, the State dismissed separate charges that B.L. had raped another victim, a thirteen-year-old girl, also in 1999.

a May 3, 2017 order, which continued his commitment to the STU after the last hearing.

It is undisputed that B.L. has been convicted of sexually violent crimes under the SVPA. The questions at his commitment hearing were whether B.L. suffered from a mental abnormality or personality disorder, and as a result, whether it was highly likely that he would be unable to control his sexually violent behavior and would re-offend. He argues primarily that the judge relied on net opinions from the State's two experts, which he contends were not based on any methodology or objective standards, and that the State produced insufficient evidence to warrant continued commitment.

The judge qualified the State's first witness, Dr. Roger Harris, without objection, as an expert psychiatrist. Before rendering his expert report, the doctor interviewed B.L. (and had previously interviewed him in 2014); and he reviewed and relied upon clinical certificates, reports from the treatment progress review committee (TPRC), prior forensic evaluations, treatment notes, and previous statements made by B.L. In addition, the doctor performed the Static-99 actuarial test to help him estimate the probability of B.L.'s sexually violent recidivism. And he considered B.L.'s offense history, various dynamic factors, personality characteristics, and lack of treatment progress.

Based on the interviews, his review of the documentation, and his own testing, Dr. Harris diagnosed B.L. with "[s]exual [s]adism [d]isorder"; "[o]ther [s]pecified [p]araphilic [d]isorder, teenage girls"; "[a]ntisocial [p]ersonality [d]isorder [(ASPD)]"; "[a]lcohol, [c]annabis and [s]timulant [u]se [d]isorders, in a controlled setting." The doctor said that these disorders do not "spontaneously remit," but rather, they require treatment where one can learn how to control impulses caused by the psychiatric disorders. Dr. Harris determined that B.L. was unable to control his impulses.

He testified that B.L.'s fundamental core issue was his lack of "self-regulation," which includes his inability to control his sexual drive and anger. The doctor believed that B.L.'s anger interfered with B.L.'s treatment. Such a belief was critical to B.L.'s continued problem controlling his violent sexual drive. At his 2017 interview, B.L. refused to discuss his past offenses, which led the doctor to conclude B.L. attempted to control the interview. The STU treatment records reflect his difficulty relating to others, his attempt to intimidate others, and his verbal altercations, which impeded his treatment progress. The records also demonstrated that B.L. remained challenging and difficult towards those who treated him. In Dr. Harris's opinion, B.L. remained vulnerable, irritable, aggressive, and unable to self-regulate, even in the

7

controlled setting of his 2017 interview, which B.L. eventually terminated on his own.

Dr. Harris concluded that B.L. would be highly likely to re-offend sexually if released from the STU. He reached that conclusion after performing a structured risk assessment, which the doctor explained was a well-established standard approach for experts assessing risk. He testified that numerous research books show how to perform these assessments and that the method is rigorous.

B.L. scored a five on the Static-99 test. Dr. Harris explained that such a score placed him in the "category of men who were above average risk to sexually re-offend." But the doctor did not rely solely on this test score. He explained that the score by itself did not fully estimate B.L.'s risk to re-offend sexually because it did not consider other relevant risk factors, such as deviant arousal from multiple paraphilias, strong antisocial attitudes and behaviors, past violations of conditions of release, poor self-regulation, an impulsive lifestyle, poor cognitive problem-solving skills, and a history of sexual violence. Dr. Harris testified that he considered other dynamic factors that the literature identifies as empirically validated.

A-2295-16T5

The State's second witness, Dr. Eugene Dunaev, is a psychologist. Like Dr. Harris, the judge admitted him as an expert without objection. In rendering his opinion, Dr. Dunaev considered his interview and treatment of B.L., and he reviewed and relied upon prior reports, various documentation, the Static-99R (which is a modified Static-99), and the Stable 2007, which is a risk-assessment tool that considers thirteen stable dynamic risk factors associated with sexual recidivism. Like B.L.'s treatment team, Dr. Dunaev recommended that B.L. continue in Phase 3A of his treatment, which is the beginning half of the core phase of treatment.

Dr. Dunaev also considered B.L.'s sexual offense history. He found significant B.L.'s sadistic themes, such as arousal from the victim's pain and crying. The doctor also reviewed B.L.'s treatment trajectory, which according to him, vacillated greatly. In the doctor's view, B.L. would show signs of doing well, but then would sabotage himself with anger and substance abuse. Like Dr. Harris, Dr. Dunaev concluded B.L. was not fully engaging in treatment. He gave several examples, including that B.L. failed to complete a written relapse prevention plan, and he did not complete personal maintenance or substance abuse contracts.

Dr. Dunaev diagnosed B.L. with "[s]exual [s]adism"; "[o]ther [s]pecified [p]araphilic [d]isorder (non-consent and hebephilia, provisional)"; marijuana, alcohol, and cocaine use disorder, in a controlled environment; "[a]ntisocial [p]ersonality [d]isorder (with borderline features)"; and "[b]orderline [i]ntellectual [f]unctioning." Dr. Dunaev also concluded that B.L. failed to address his continued anger problem. The doctor stated that B.L. scored a four on the Static-99R test, which placed him in the above average category of sexual re-offense. And on the Stable 2007, he scored a sixteen out of twenty-four, which falls into the high level of people likely to re-offend. He also scored twenty-eight (indicating a high range of psychopathic traits) on a PCL-R test, which is a psychological assessment tool used to assess the presence of psychopathy in individuals.

Dr. Barry Zakireh, a psychologist and B.L.'s expert witness, diagnosed B.L. with other specified paraphilic disorder with features of sexual sadism, ASPD, and several substance abuse disorders. The doctor believed that these diagnoses should be treated more like dynamic risk factors, rather than persistent ones. But he agreed that the paraphilic disorder predisposed B.L. to re-offending sexually. Nevertheless, he concluded that B.L. is "less than likely" to re-offend sexually if released with conditions.

A-2295-16T5

The judge found by clear and convincing evidence that B.L. suffers from disorders with sexual sadism traits that were "not going to go away." Although the judge acknowledged that B.L. had shown some positive treatment effects, particularly in the months before the 2017 review hearing, the judge still found that B.L. remained unable to control his sexually violent behavior rendering him highly likely to re-offend sexually. The judge found all of the experts credible, but did not agree with Dr. Zakireh's opinion regarding B.L.'s likelihood of re-offending. Moreover, the judge found that B.L. demonstrated sadistic traits and a total disregard for his victims; and that his mental conditions continue to affect him emotionally, cognitively, and volitionally. Consequently, the judge concluded that B.L. would have serious difficulties controlling his sexually violent behavior thereby rendering him highly likely to re-offend sexually. Although the judge had accelerated B.L.'s next commitment hearing (seven months away, instead of the usual one-year period), B.L. canceled it pending adjudication of this appeal.

### III.

Between 1987 and 1988, H.B. raped his nine-year-old daughter at least six times. He pled guilty, in 1989, to second-degree sexual assault, N.J.S.A. 2C:14-2(a)(1); and third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4.

11

He received an aggregate five-year prison term. H.B. also admitted to raping three or four other victims, for which he was never charged. In 1993, H.B. raped a woman whom he was in a romantic relationship with. For that incident, he pled guilty to three counts of sexual assault, N.J.S.A. 2C:14-2(c)(1); and possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d). As to the weapons offense, he had used a knife while he sexually assaulted her. For the 1993 convictions, he received an aggregate ten-year prison term with five years of parole ineligibility. While imprisoned, he received at least six institutional charges, including assault on a police officer.

In 2001, H.B. was involuntarily committed to the STU. But he was then transferred to administrative segregation at East Jersey State Prison for assaulting an officer. Thereafter, he received another charge for assaulting an officer. H.B. has had a history of incarcerations followed by involuntary commitments.[2] He has had multiple commitment hearings under the SVPA, and he has remained confined to the STU. Now, H.B. appeals from a December 20, 2016 order, which continued his involuntary commitment to the STU after the last hearing.

---

[2] We affirmed an April 2, 2012 order continuing his involuntary commitment. In re Civil Commitment of H.B., No. A-6154-11 (App. Div. Nov. 13, 2012).

A-2295-16T5

It is undisputed that H.B. has been convicted of sexually violent crimes under the SVPA. The questions at his commitment hearing were whether H.B. suffered from a mental abnormality or personality disorder, and as a result, whether it was highly likely that he would be unable to control his sexually violent behavior and would re-offend. He argues primarily, like B.L., that the judge relied on net opinions from the State's two experts, which he also contends were not based on any methodology or objective standards, and that the State produced insufficient evidence to warrant continued commitment.

The judge qualified the first witness, Dr. Roger Harris, as a psychiatrist. He examined H.B., reviewed a multitude of documentation customarily relied on by similar experts performing risk assessments, and then arrived at his own diagnosis and conclusions. The doctor diagnosed him with pedophilic disorder (incest); paraphilic disorder (coercion); multiple substance abuse disorders; recurrent major depressive disorder; and a personality disorder with antisocial features.

Dr. Harris opined that these disorders predisposed H.B. to committing sexually violent offenses. They have affected him emotionally and cognitively, and have caused volitional deficits. He has a history of poor self-regulation and engaging in self-harm, such as cutting his anus and inserting a bottle into his

rectum. H.B. told the doctor that he still fantasizes about his daughter, which led Dr. Harris to conclude that H.B.'s arousal to children remains a risk. H.B.'s personality disorder manifested itself in poor problem-solving skills, impulsivity, and recklessness.

H.B. scored a two on the Static-99R test. Dr. Harris concluded that this score underestimated H.B.'s risk. The doctor utilized the test as one factor among many in his evaluations. Although Dr. Harris has used the actuarial tool because it is part of accepted standard practices in his field, he stated that the test is limited in its ability to measure an individual's risk to re-offend. For example, it does not include dynamic or protective factors that may affect risk assessment.

The doctor considered the presence of other risk factors, which empirically have been shown to increase risk of sexual re-offending. He explained that H.B. has comorbid paraphilias, which empirically demonstrate an increase risk of re-offending. And H.B.'s substance abuse disorders increase the risk of re-offending because substance abuse plays a role in H.B.'s offending dynamics and further compromises his ability to self-regulate. Dr. Harris stated that his risk assessments also include his clinical judgment.

The judge qualified the State's second witness, Dr. Christine Zavalis, as a psychologist. The TPRC gave H.B. multiple opportunities to interview, but he declined. Dr. Zavalis evaluated H.B. as part of the TPRC's annual review, but because he would not appear for interviews, she did so based on documentary evidence, which comprised those documents customarily relied on by experts in her field.

Dr. Zavalis diagnosed H.B. with other specified paraphilic disorder (non-consent); other specified personality disorder with antisocial and schizoid traits; intermittent explosive disorder; several substance abuse disorders; and post-traumatic stress disorder (PTSD). Additionally, she provisionally diagnosed him with pedophilic disorder and sexual sadism disorder because she had sufficient information to suggest these disorders and not enough to rule them out. Dr. Zavalis testified that H.B.'s paraphilic and personality disorders predisposed him to re-offend.

H.B. scored a three on the Static-99, which placed him in a category of offenders who sexually re-offend at an average rate. Although he showed some signs of improvement on other dynamic risk factors, Dr. Zavalis identified signs of negative emotionality, anger, paranoia, and depression, for which he was medicated. Dr. Zavalis said that according to the Static-99 manual, evaluators

15

must consider information outside that test to perform a full assessment of risk. Dr. Zavalis described this as a "clinically adjusted actuarial approach" to risk assessment.

H.B. has been in Phase 3A treatment, which is the core phase of treatment. Although H.B. had showed some signs of improvement, he still had incidents of lashing out verbally. Dr. Zavalis emphasized that H.B. needed greater insight into his arousal. She stated that H.B. must spend time in the Therapeutic Community, which includes intense scrutiny and responsibility, before he is released from the STU. Dr. Zavalis opined that H.B. was highly likely to re-offend sexually. She based that opinion on risk factors—from the Static-99 and the Stable-2007—and other factors not mentioned in those measures, such as medical mitigation and treatment effect.

Finally, Dr. Gianni Pirelli, a psychologist, testified for H.B. He interviewed H.B. and diagnosed him with paraphilic disorder for non-consent ("not active"); a mood disorder (that might be bipolar disorder); and a history of substance abuse disorders. Dr. Pirelli does not use the Static-99, and places no significance on the PCL-R assessment tool. But as to the PCL-R, he admitted that it addresses antisocial traits, which are a risk factor, especially when combined with a paraphilic arousal. He concluded "there's probably [not] much

disagreement between me and the treatment team and Dr. Zavalis other than the fact that I think we just need to be much more refined and focused" by giving H.B. tasks in his treatment. And he testified that H.B. should remain at the STU for at least nine additional months.

The judge found by clear and convincing evidence that H.B. had been convicted of sexually violent offenses, he suffers from mental abnormalities and a personality disorder that predispose him to commit sexually violent offenses, and that he is highly likely to engage in future acts of sexual violence if not confined to the STU. In rendering his opinion, the judge remarked that none of the experts was required to predict the future, only to give his or her best estimates about an individual's risk.

IV.

On appeal, B.L. raises the following arguments:

POINT I

B.L.'S COMMITMENT IS IMPROPERLY BASED ON THE STATE EXPERTS' INADMISSIBLE NET OPINION.

A. Neither State Expert Could Provide Any Probability Basis for Finding that B.L. Is "Highly Likely" to Re[-]offend.

B. The Static-99 Risk Assessment Tool Demonstrated B.L.'s Risk of Sexually Re[-]offending Was Below [Fifty Percent].

C. The State Experts Could Not Point to Any Methodology or Objective Standards Used to Reach Their Finding.

D. The Hanson and Mann Article Demonstrates that Empirical Data Does Not Support Using the State's List of Dynamic Risk Factors to Adjust Upward B.L.'s Risk of Re[-]offending.

E. Both State Experts Ignored Base Rate Data that Was Relevant to Determine B.L.'s Risk of Re[-]offending.

F. The State Experts Failed to Correlate B.L.'s PCL-R Score with Finding He Was Highly Likely to Re[-]offend.

G. The State Experts Failed to Correlate Any STABLE-2007 Score with Finding B.L. Highly Likely to Re[-]offend.

H. Both State Experts Based Their Risk Assessment on "Facts" They Acknowledged Were Inaccurate or Outdated.

I. Dr. Zakireh, B.L.'s Expert, Was the Only Witness Who Used Empirically Validated Risk Assessment.

18

POINT II

REVERSAL IS REQUIRED BECAUSE THE STATE INTRODUCED NO EVIDENCE THAT B.L. HAS A CURRENT MENTAL ABNORMALITY OR PERSONALITY DISORDER THAT MAKES HIM A CURRENT RISK OF BEING HIGHLY LIKELY TO SEXUALLY RE[-]OFFEND.

On appeal, H.B. makes the following arguments, which we have renumbered:

POINT III

THE STATE EXPERTS' TESTIMONY LACKED AN EMPIRICAL BASIS AND CONSTITUTED INADMISSIBLE NET OPINION.

A. The State Experts Could Not Define What They Meant When They Said H.B. Was Highly Likely to Sexually Re[-]offend.

B. The State Experts Could Not Point to Any Methodology or Objective Standards Used to Reach Their Finding.

C. The State Experts Used No Objective Peer-reviewed Guidelines to Reach Their Conclusion.

D. Both State Experts Ignored Base Rate Data that Was Relevant to Determine H.B.'s Risk of Re[-]offending.

19

E. The State Experts Failed to Correlate H.B.'s Static-99 Score with Finding That He Is Highly Likely to Re[-]offend.

F. The State Experts Failed to Correlate H.B.'s PCL-R Score with Finding He Was Highly Likely to Re[-]offend.

G. The State Experts Failed to Correlate Any Stable-2000 Score with Finding H.B. [Was] Highly Likely to Re[-]offend.

POINT IV

THIS COURT MUST REVERSE H.B.'S COMMITMENT ORDER SINCE IT WAS BASED ON STATE EXPERTS' TESTIMONY THAT FAILS TO MEET ADMISSIBILITY REQUIREMENTS OF NEW JERSEY EVIDENCE RULE 702.

POINT V

THE TRIAL COURT'S DECISION TO COMMIT H.B. WAS BASED ON "FACTS" UNSUPPORTED BY THE RECORD.

A. The Trial Court Erred in Finding that Dr. Pirelli Concluded that H.B. Is "Highly Likely" to Re[-]offend.

B. The Trial Court Falsely Assumed that Dr. Pirelli Found That H.[B]. Was Clearly Predisposed to Sexual Violence.

C. The Trial Court Falsely Assumed that H.B. Had No Family History of Incest and Improperly Dismissed Dr. Pirelli's Rejection of a Pedophilia Diagnosis.

20

D. The Trial Court Falsely Assumed that H.B. Engaged in Multiple Sexual Assaults Against His Daughter, Including Physical Force, Threats and Penetration.

E. The Trial Court Mischaracterized Dr. Zavalis on the Predictability of Her Methodology.

F. The Trial Court Erred in Concluding that H.B. Has Been in Sex Offender Treatment for Only [Three to Four] Years.

POINT VI

REVERSAL IS REQUIRED BECAUSE THE STATE INTRODUCED NO EVIDENCE THAT H.B. HAS A CURRENT MENTAL ABNORMALITY OR PERSONALITY DISORDER THAT MAKES HIM A CURRENT RISK OF BEING HIGHLY LIKELY TO SEXUALLY RE[-]OFFEND.

V.

"The scope of appellate review of a commitment determination is extremely narrow." In re Civil Commitment of R.F., 217 N.J. 152, 174 (2014) (quoting In re D.C., 146 N.J. 31, 58 (1996)). "The judges who hear SVPA cases generally are 'specialists' and 'their expertise in the subject' is entitled to 'special deference.'" Ibid. (quoting In re Civil Commitment of T.J.N., 390 N.J. Super. 218, 226 (App. Div. 2007)). Where a trial judge's findings are supported by

21

sufficient credible evidence in the record, they should not be disturbed. Id. at 175.

In commitment hearings, the judge makes the final determination about whether an individual is highly likely to re-offend sexually. Id. at 174. That is because courts must balance "society's interest in protection from harmful conduct against the individual's interest in personal liberty and autonomy." Ibid. The ultimate determination is a legal one, not a medical one. Ibid.

Moreover, we give deference to findings by judges because they have the "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." Ibid. (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). We will not overturn a trial court's findings even if we "might have reached a different conclusion were [we] the trial tribunal" or because "the trial court decided all evidence or inference conflicts in favor of one side" in a close case. Id. at 175 (quoting Johnson, 42 N.J. at 162). Therefore, we should not change a trial judge's determination to commit or release an individual unless "the record reveals a clear mistake." Ibid.

VI.

We now address the contentions that the State's experts rendered net opinions. An expert "may not provide an opinion at trial that constitutes 'mere

A-2295-16T5

net opinion.'" Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 410 (2014) (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 372 (2011)). Such a rule bars admission of an "expert's conclusions that are not supported by factual evidence or other data." Townsend v. Pierre, 221 N.J. 36, 53-54 (2015) (quoting Polzo v. Cty. of Essex, 196 N.J. 569, 583 (2008)). Instead, it requires an expert to provide the "why and wherefore" that supports his or her opinion. Id. at 54. Therefore, an expert must provide the factual basis and analysis that support the opinion. Davis, 219 N.J. at 410. Courts "may not rely on expert testimony that lacks an appropriate factual foundation and fails to establish the existence of any standard about which the expert testified." Ibid. (quoting Pomerantz Paper, 207 N.J. at 373).

(1)

As to the expert testimony in B.L.'s hearing, B.L.'s counsel never argued that Dr. Dunaev rendered net opinions and counsel did not object at the hearing to Dr. Harris rendering net opinions. But on a limited remand to reconstruct part of the record, B.L.'s counsel moved for the first time to strike only the testimony of Dr. Harris along those lines, which the judge denied. We conclude that the judge did not abuse his discretion by admitting the expert opinion testimony

23

from Dr. Harris, and that there is no plain error as to Dr. Dunaev.  We reach these conclusions because Drs. Harris and Dunaev did not render net opinions.

Drs. Harris and Dunaev provided the judge with the "why and wherefore" of their opinions, each detailing the factual basis supporting their independent opinions that B.L. would be highly likely to re-offend if released at this point in his treatment.  The doctors reviewed in detail B.L.'s history of sexual violence, treatment history, diagnosis, and a multitude of other factors.  They interviewed B.L., utilized actuarial or analytical tools—Dr. Harris the Static-99, and Dr. Dunaev the Static-99R and the Stable 2007.  They diagnosed B.L. with specific disorders that predisposed him to committing acts of sexual violence, and explained which facts indicated that B.L. continued to have serious difficulty controlling the harmful behavior stemming from these disorders, despite some recent progress in treatment.  Thus, neither Dr. Harris nor Dr. Dunaev gave mere unsubstantiated conclusions that would contravene the net opinion rule.

B.L. essentially contends that the doctors should have analyzed the available information in the same way that Dr. Zakireh did, and that they should have come to the same conclusion as Dr. Zakireh.  But "[t]he failure of an expert to give weight to a factor thought important by an adverse party does not reduce his testimony to an inadmissible net opinion if he otherwise offers sufficient

reasons which logically support his opinion." Rosenberg v. Tavorath, 352 N.J. Super. 385, 402 (App. Div. 2002). If an expert provides a sufficient factual basis for an opinion but fails to consider other significant facts or data, that is a proper topic for cross-examination, but it does not provide grounds to bar the opinion as a net opinion. Ibid.

(2)

At H.B.'s hearing, his counsel did not object to the testimony from Drs. Harris and Zavalis. But in his closing statement to the judge, counsel argued that their testimony should not be credited and they "should be entirely rejected as inadmissible net opinion[s]." Counsel contended that "[a]bsent empirical testable information, the State [was] using its unguided clinical judgment in making a risk prediction." We see no plain error because the doctors' testimony did not amount to net opinions.

Drs. Harris and Zavalis provided the judge with the "why and wherefore" of their opinions, each detailing the factual basis supporting their independent opinions that H.B. would be highly likely to re-offend if released without showing more progress in treatment. They reviewed H.B.'s history of offending, treatment history, present diagnosis, and present progress in treatment. Dr. Harris personally interviewed H.B., and Dr. Zavalis would have done so but for

25

H.B.'s refusal. Each used the Static-99 as an actuarial tool, and separately diagnosed H.B. with disorders that predisposed him to committing acts of sexual violence, and they explained which facts indicated that H.B. continued to have serious difficulty in controlling his behavior stemming from these disorders, despite some recent progress in treatment.

(3)

We reject any suggestion that the State's experts rendered net opinions in both appeals because—as counsel for B.L. and H.B. contends—the experts failed to provide any probability basis for their conclusions, failed to correlate actuarial data and test scores, ignored base rate data, used inaccurate or outdated facts, and did not use the same methodology as Dr. Zakireh. B.L. and H.B. essentially argue that the State's experts provided opinion testimony that used unacceptable methodology.[3]

---

[3] We received a letter dated February 19, 2019 from counsel for the State drawing our attention, under Rule 2:6-11(d), to our decision in In re Commitment of A.Y., ___ N.J. ___ (App. Div. 2019). In her letter, counsel stated that in that case we addressed the Court's recent decision in In re Accutane Litigation, 234 N.J. 340 (2018) and that we concluded that actuarial instruments are an accepted factor, which may be considered in assessing risk of re-offending sexually. At oral argument before us, counsel for B.L. and H.B. contended for the first time that the methodology used by the State's experts failed to satisfy Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993). Inasmuch as there was no objection to the testimony from the State's experts

As we indicated in the beginning of our opinion, the State need not prove inability to control behavior with "mathematical precision." See Crane, 534 U.S. at 413. The Court declined to impose a precise standard to measure the requisite "lack of control" stating "there must be proof of serious difficulty in controlling behavior." Ibid. Contrary to B.L. and H.B.'s contentions, under the net opinion rule, experts are not required to organize or support their opinions in a specific manner "that opposing counsel deems preferable." Townsend, 221 N.J. at 54.

Dr. Pirelli testified that "[w]e can't predict future sexual [re-]offending . . . with any real accuracy." He acknowledged that he defers to the judge as to the legal question of whether an individual is "highly likely" to re-offend. And on that question, established case law has addressed the reliability of actuarial tests. For example, we previously recognized that the Static-99 was designed to "predict long-range risk for sexual recidivism by combining two well standardized risk assessment scales." In re J.P., 339 N.J. Super. 443, 451 (App. Div. 2001). And the Static-99 is a recognized "actuarial test used to estimate

during the hearings, and there was no mention of Daubert to the judge, we decline to address that decision here. Instead, we rely on the long-standing precedent in SVPA cases as to the acceptability of the methodology used by the State's experts.

27

the probability of sexually violent recidivism." R.F., 217 N.J. at 164 n.9. We have acknowledged that scientific literature has shown "the use of actuarial concrete predictors is at least as good, if not in most cases better, in terms of reliability and predictability than clinical interviews." In re Registrant, C.A., 146 N.J. 71, 106 (1996). Scientific literature and expertise accords weighing risk factors, which the Court has said is an acceptable method of predicting future criminal sexual behavior. Id. at 105. Furthermore, actuarial instruments are "generally accepted by professionals who assess sex offenders for risks of re[-]offense." In re Commitment of R.S., 339 N.J. Super. 507, 538 (App. Div. 2001). Use of the instruments has been accepted in at least six other states. Id. at 548. Finally, we concluded that actuarial instruments satisfy Frye.[4] Actuarial information is "simply a factor to consider, weigh, or even reject, when engaging in the necessary fact[-]finding under the SVPA." R.F., 217 N.J. at 164 n.9 (quoting In re Commitment of R.S., 173 N.J. 134, 137 (2002)). As we explained in R.S.,

> [s]ince expert testimony concerning future dangerousness based on clinical judgment alone has been found sufficiently reliable for admission into evidence at criminal trials, we find it logical that testimony based upon a combination of clinical judgment and actuarial instruments is also reliable. Not

---

[4] Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

only does actuarial evidence provide the court with additional relevant information, in the view of some, it may even provide a more reliable prediction of recidivism.

[339 N.J. Super. at 537-38.]

To the extent that we have not addressed the arguments raised by B.L. and H.B., we conclude that they are without sufficient merit to warrant attention in this opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION